## IN THE COURT OF APPEALS OF IOWA

No. 16-0975
Filed October 26, 2016

**IN THE INTEREST OF M.S.,**
**Minor child,**

**T.B.-W., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

        A father appeals from the order terminating his parental rights. **REVERSED AND REMANDED.**

        Matthew W. Boleyn of Reynolds & Kenline, L.L.P., Dubuque, for appellant father.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

        Sandra P. Trevino of Hammer, Simon & Jensen, P.C., East Dubuque, Illinois, guardian ad litem for minor child.

        Considered En Banc.

**MCDONALD, Judge.**

The termination of a parent's rights inflicts a unique deprivation of a constitutionally protected liberty interest upon the affected parent. The innocent man can be set free. The landowner can be justly compensated. The childless parent has no recourse. Thus, "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). Accuracy requires careful review of the evidence to determine whether the State has come forward with the quantum and quality of evidence necessary to prove the statutory grounds authorizing the termination of a parent's rights. Justness requires consideration of any countervailing consideration that may preponderate against the termination of a parent's rights.

I.

This case involves Thomas, a father, who appeals from the order terminating his parental rights in his child pursuant to Iowa Code section 232.116(1)(h) and (*l*) (2015). M.S., the child at issue, came to the attention of the Iowa Department of Human Services ("IDHS") when he tested positive for THC at birth in June of 2015. The mother and a man initially believed to be the father were contacted by IDHS. The mother admitted to marijuana use, did not follow through with random drug testing, and did not follow through with a substance abuse evaluation. After the mother failed to show any progress, M.S. was removed from the mother's home and adjudicated in need of assistance. The mother has not had any contact with M.S. since November 2015.

IDHS learned the man believed to be M.S.'s father was not his father. In December 2015, IDHS and Thomas had their first communication regarding the child at issue. DNA testing confirmed Thomas's paternity of the child. At the time IDHS commenced communication with Thomas, he was twenty-one years of age, living with his mother, and employed full-time. Thomas admitted to the social worker he had been a long-time user of cannabis, including marijuana and cannabis oils. IDHS put in place a family plan, requiring Thomas to take anger management classes and abstain from cannabis use.

Thomas substantially complied with the IDHS's plan over the ensuing months. He attended anger management sessions as instructed. Thomas demonstrated the capacity to provide for the physical needs of the child. Thomas maintained full-time employment. Thomas obtained his own residence. The social worker found the home was safe and appropriate for the child. Thomas attended every visitation—up to four per week—with the child. The social worker thought the visits went well. The one area in which Thomas's compliance lacked was the cessation of cannabis use. He attended counseling sessions, but continued to use for at least some period of time while the case was pending. For this reason alone the State sought to terminate Thomas's parental rights.

The matter came on for a termination hearing in May 2016, only five months after IDHS commenced communication with Thomas. The social worker testified Thomas continued to test positive for THC. She also testified, however, that she never observed Thomas interact with the child while under the influence, that she had no concerns that he would supervise the child while under the influence, and that she had no concerns regarding the safety of the child while in

Thomas's care. Thomas admitted he continued to use for some period after the case commenced, but he testified his use was decreasing and his last use was in April 2016. The district court granted the State's petition to terminate Thomas's parental rights pursuant to Iowa Code section 232.116(1)(h) and (*l*). Thomas timely filed this appeal.

## II.

"[T]he relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). "[T]he custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). At the same time, "[t]he State has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it." *In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014).

Iowa Code chapter 232 codifies the balance our legislature has struck between these competing interests. Pursuant to section 232.116(1), the State must prove a statutory ground authorizing the termination of a parent's rights. *See In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). Section 232.116(1) sets forth the harms the legislature has determined to be of sufficient concern to justify the breakup of the family unit. It is not sufficient to prove the parent engaged in immoral or illegal conduct without a showing of harm. *See* Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 459 (1897) ("The first thing for a business-like understanding of the matter is to understand its limits, and therefore I think it desirable at once to point out and dispel a confusion

between morality and law, which sometimes rises to the height of conscious theory, and more often and indeed constantly is making trouble in detail without reaching the point of consciousness."). Indeed, due process would be violated if the State "attempt[ed] to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Quilloin*, 434 U.S. at 255. Second, pursuant to section 232.116(2), the State must prove termination of parental rights is in the best interest of the child. *See P.L.*, 778 N.W.2d at 39. Third, if the State has proved both the existence of statutory harm and termination of a parent's rights is in the best interest of the child, the court must consider whether any countervailing considerations set forth in section 232.116(3) should nonetheless serve to preclude termination of parental rights. *See id.*

The State has the burden to prove its case by clear and convincing evidence. *See* Iowa Code § 232.96. Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. *See In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995). It is the highest evidentiary burden in civil cases. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence. *See id.* This significant burden is imposed on the State to minimize the risk of an erroneous deprivation of the parent's fundamental liberty interest in raising his child. *See Santosky*, 455 U.S. at 759. We therefor cannot rubber stamp what has come before; it is our task to ensure the State has come forth with the quantum and quality of evidence necessary to

prove each of the elements of its case. *See id.* at 769 ("A majority of the States have concluded that a 'clear and convincing evidence' standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns. We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process.").

III.

When we pull this particular dragon out of its cave to count its teeth and claws in the light of day, we can see it is without strength. *See* Holmes, 10 Harv. L. Rev. at 469.

A.

We first address the sufficiency of the evidence supporting the statutory grounds authorizing termination of parental rights. The juvenile court terminated the father's rights pursuant to section 232.116(1)(*l*), which requires the State to prove the following:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102;
> (2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts;
> (3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

"Substance-related disorder" is defined by statute to mean "a diagnosable substance abuse disorder of sufficient duration to meet diagnostic criteria specified within the most current diagnostic and statistical manual of mental disorders published by the American psychiatric association that results in a

functional impairment." Iowa Code § 125.2(14). The State did not produce any evidence the father has a "diagnosable substance abuse disorder." The State also did not produce any evidence the father presents a danger to himself or others. The social worker involved with this family testified to the contrary—she had no safety concerns. The State failed to meet its burden of production and persuasion with respect to this ground. *See, e.g.*, *In re M.F.*, No. 16-0434, 2016 WL 2743488, at *3 (Iowa Ct. App. May 11, 2016).

The juvenile court also terminated the father's rights pursuant to section 232.116(1)(h).[1] This section requires the State to prove by "clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(h)(4). "[A] child cannot be returned to the custody of the child's parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992).

What was the adjudicatory harm authorizing the termination of this parent's rights? We find none. The evidence established Thomas was able to meet the physical needs of the child. Thomas maintained full-time employment

---

[1] The State contends Thomas failed to preserve his challenge to this ground because he admitted the child could not be returned to his care at the time of the termination hearing. We disagree. First, the statute requires the State to prove the child would be exposed to an appreciable risk of adjudicatory harm. Second, Thomas did not admit the child would be exposed to adjudicatory harm if returned to his care at the time of the termination hearing. Instead, he testified it would not be inappropriate to have a transition period. Third, this is not an issue of error preservation. Even if the parent admitted return of the child would expose the child to adjudicatory harm, the admission only serves as strong evidence, perhaps irrefutable evidence, in support of the State's case. The testimony does not waive the issue or relieve the State of its burden of proof.

in a position he has held for more than three years. The social worker found Thomas's home was safe and appropriate for the child. The guardian ad litem's report noted the "home is appropriate, clean and there are no immediate safety concerns." The social worker testified the father has everything he needs for the child. This was evidenced during visitations, during which the father provided for the child's physical needs, including clothing, food, and diapers.

The evidence established Thomas was eager and able to meet the emotional and social needs of the child. The father attended every single visitation—up to four per week—with the child. Thomas had to make special arrangements with his employer to make sure he was able to attend each and every visitation. This required careful planning on his part and evidences his intent to parent this child. The social worker thought the visits went well. She testified Thomas has "the skills necessary to parent the child." The Family Safety, Risk, and Permanency (FSRP) reports document Thomas's visits with the child. They contain numerous entries demonstrating Thomas's good parenting skills. By way of example:

> Thomas reported that [M.S.] has a Dr appointment coming up and plans on attending so he can be more informed about his health. . . . Thomas was attentive to M.S.'s needs. He burped him, cleaned the booger's from his nose, and cleaned up his spit up. M.S. was sitting up by himself on the floor. He swung his hands in the air smiling and laughing, lost his balance, and fell backwards. Thomas was quick to console him and make sure he was ok. M.S. did not fuss much about the fall.

From another visit:

> M.S. was happy to see Thomas when he seen [sic] him he smiled and started kicking his legs in joy. Thomas was very happy to see M.S. he picked him up and checked up on him about weather [sic] or not he needed to be changed or if he has ate [sic]. He played

with M.S. until he was tired and took a nap. Later he woke up and Thomas was quick to feed him and change him to make sure he was happy.

The State and the dissent contend Thomas's alleged anger management issues support the termination of Thomas's parental rights. Neither the State nor the dissent identifies the specific adjudicatory harm within the meaning of section 232.102 which this fact allegedly supports. Regardless, there is not clear and convincing evidence that Thomas's temperament poses an appreciable risk of adjudicatory harm to the child. Although the social worker originally thought anger management sessions might be helpful to Thomas, the concerns were unfounded. She testified there were three minor incidents near the beginning of the case where Thomas was frustrated and acted angrily but testified there was no recent conduct giving her any concern. Importantly, there is no evidence Thomas directed any anger or frustration toward the child. There is also no evidence Thomas engaged in any physical violence toward anyone during the pendency of this case. In any event, Thomas attended anger management sessions as set forth in the case plan. The social worker conceded the alleged anger management issue "would not give [her] pause as far as [the father] having interactions" with the child.

The State and dissent also contend Thomas testing positive for cannabis in contravention of the case plan is sufficient evidence to support the termination of his parental rights. The failure to comply with the case plan is not enough. The authority to terminate a parent's rights is wholly a creature of statute. The legislature has enacted a comprehensive scheme specifying the exclusive grounds upon which the State can seek to terminate a parent's rights. *See* Iowa

Code § 232.116(1)(a)-(p). Absent from this comprehensive scheme is the authority to terminate a parent's rights for mere failure to comply with IDHS's case plan. The fact the legislature has not included this ground within this exclusive statutory scheme establishes the failure to comply with the case plan, standing alone, is not sufficient grounds to justify the termination of parental rights. *See generally Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 835 (Iowa 2002) (stating courts are "guided by the maxim 'expressio unius est exclusio alterius,' i.e., the 'expression of one thing is the exclusion of another,'" stating the exclusion of an item from a comprehensive statute is evidence of the legislature's intent); *In re C.L.H.*, 500 N.W.2d 449, 453 (Iowa Ct. App. 1993), *overruled on other grounds by P.L.*, 778 N.W.2d at 39 ("The failure of the parents to comply with DHS's case plan cannot be an independent ground to terminate parental rights."). Indeed, the termination of parental rights because of a parent's failure to follow the case plan, without a showing of harm, would run afoul of due process. *See Quilloin*, 434 U.S. at 255; *In re C. and K.*, 322 N.W.2d 76, 81 (Iowa 1982) (interpreting termination statute to require proof of harm to avoid constitutional infirmity).

The dissent contends Thomas was dishonest regarding his cannabis use because Thomas tested positive after April 2016 and because the social worker testified the drug test result–in December—was one of the highest levels she had ever seen. Neither fact supports the dissent's position. First, hair tests for marijuana encompass a ninety-day period. A positive test in May would relate back to February, prior to Thomas's last admitted use. Second, the quantity of THC metabolite detected in a hair test has no correlation to the frequency or

amount of use.  *See* Michelle Taylor et al, *Comparison Of Cannabinoids In Hair With Self-Reported Cannabis Consumption In Heavy, Light And Non-Cannabis Users*, Drug and Alcohol Review (Early View June 14, 2016), http://onlinelibrary.wiley.com/doi/10.1111/dar.12412/pdf ("Furthermore, we were unable to use hair testing to determine the quantity of cannabis used by an individual in a specified time frame. As a result, the real life application of hair testing for cannabis use is likely to be limited.").  The laboratory conducting the test in this case specifically does not distinguish among low, medium, and high use of cannabis based on the quantity of metabolites present in the hair sample because, with respect to marijuana, the quantity has no correlation to frequency or amount of use, unlike other drugs.  From the hair-test data one can soundly conclude only that Thomas used marijuana between February and May, a fact not in dispute.  It is a mistake to go further, as the dissent does, to draw an inference of recent and significant use unsupported by medical literature and unsupported by the laboratory actually conducting the test and reporting the results.

Even assuming the test results could be interpreted as the dissent suggests, the mere fact of use does not establish adjudicatory harm.  *Cf.* Iowa Code § 232.2(6)(n) (listing as adjudicatory harm a parent's "drug or alcohol abuse [that] *results in the child not receiving adequate care*" (emphasis added)); Iowa Code § 232.116(1)(*l*) (requiring proof of harm to self or others); *see In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) (holding mother's use of methamphetamine, in and of itself, did not constitute adjudicatory harm); *In re J.W.*, No. 14-0515, 2014 WL 3749419, at *3 (Iowa Ct. App. July 30, 2014) (holding the mother's

status as a prior substance abuser did not necessarily establish adjudicatory harm); *In re L.R.*, No. 09-1544, 2010 WL 200817, at *7 (Iowa Ct. App. Jan. 22, 2010) (reversing termination order where State failed to establish nexus between parent's alcohol abuse and risk of adjudicatory harm to the child).

Instead, the State must establish a nexus between the father's cannabis use and an appreciable risk of adjudicatory harm to the child within the meaning of section 232.102. *See, e.g.*, *In re Rebecca C.*, 175 Cal. Rptr. 3d 264, 269 (Cal. Ct. App. 2014) ("In other words, DCFS essentially argues that, when a parent engages in substance abuse, dependency court jurisdiction is proper. This is not what the dependency law provides. Further, if DCFS's position were accepted, it would essentially mean that physical harm to a child is presumed from a parent's substance abuse under the dependency statutes, and that it is a parent's burden to prove a negative, i.e., the absence of harm. Again, this is not what the dependency law provides."); *L.D. v. Dep't of Children & Family Servs.*, 957 So. 2d 1203, 1205–06 (Fla. Dist. Ct. App. 2007) (holding drug addiction, standing alone, is insufficient basis to terminate parental rights); *In re Adoption of Zoltan*, 881 N.E.2d 155, 161 (Mass. App. Ct. 2008) (reversing termination of parental rights where agency failed to demonstrate nexus between marijuana use and parenting ability); *In re Danalia L.*, No. 1-10-2906, 2011 WL 10072924, at *3 (Ill. App. Ct. Mar. 25, 2011) (affirming dismissal of case where there was no evidence establishing a nexus between marijuana use and harm to the children or that "the marijuana use created an injurious environment"); *In re Children of T.R.*, 750 N.W.2d 656, 663 (Minn. 2008) (holding "substance or alcohol use alone does not render a parent palpably unfit"); *New Jersey Div. of Child Prot. &*

13

*Permanency v. C.R.*, No. FN-09-111-12, 2015 WL 3726304, at *4 (N.J. Super. Ct. App. Div. June 16, 2015) ("When drug use is a basis for an allegation of abuse and neglect, there must be proof that the drug use exposed the child to imminent danger or a substantial risk of harm."); *Dep't of Human Servs. v. C.J.T.*, 308 P.3d 307, 310 (Or. Ct. App. 2013) (holding past marijuana use, without nexus between current use and threat of harm to the children, was insufficient to support termination of parental rights); *Dep't of Human Servs. v. A.M.C.*, 260 P.3d 821, 825 (Or. Ct. App. 2011) ("[A] parent's condition, even if reprehensible or pathological, does not justify termination of parental rights unless the conduct or condition is seriously detrimental to the child. The conduct or condition, in other words, does *not* speak for itself."); *In re A.T.E.*, 222 P.3d 142, 148 (Wyo. 2009) (affirming denial of termination petition where agency did not provide evidence linking father's marijuana use with "his unfitness as a parent"). As noted above, due process requires the termination statute to be interpreted to require proof of harm. *See See Quilloin*, 434 U.S. at 255; *In re C. and K.*, 322 N.W.2d at 81.

The record does not establish a nexus between Thomas's cannabis use and an appreciable risk of adjudicatory harm to the child. The State attempts to spackle the evidentiary cracks and holes in its case with speculation-and-conjecture putty. Speculation and conjecture are not enough; clear and convincing evidence is required. Here, Thomas testified he has never interacted with the child while impaired and would not do so. He testified his last use of cannabis was in April 2016 and his days of cannabis use were behind him. The social worker testified she never observed Thomas interact with the child while

impaired. She testified she did not believe Thomas would use while supervising the child. The social worker conceded Thomas's conduct was not a safety concern with respect to the child. The prosecutor conceded during closing argument that the child's safety was not at issue. In the final FSRP report provided to the juvenile court prior to the termination hearing, Thomas's protective capacity was praised:

> Thomas has the support of his Mother, Sister, Girlfriend, and brother. Thomas has proven able to provide [a] safe home and stable place for M.S. Thomas has been motivated to do what he needs to done [sic] in order for him to have M.S. full time. He has been able to have a stable home for him and M.S. and attended meetings with SASC. Thomas has been able to show proof that he has a stable home and job in which he can pay all of his bills. He has been able to provide[ ] food and clothing during every visit.

In sum, there is not clear and convincing evidence establishing a nexus between the father's conduct and an appreciable risk of adjudicatory harm to the child. The State's reports admit as much. The social worker involved in the case admitted as much. The prosecutor admitted as much. We agree.

B.

The failure to prove the statutory grounds authorizing termination of Thomas's rights requires reversal. We nonetheless address whether the State proved by clear and convincing evidence whether termination of Thomas's parental rights is in the best interest of the child. "When we consider whether parental rights should be terminated, we 'shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.'" *In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016) (quoting Iowa

Code § 232.116(2)). In making this determination, we may consider a number of factors. *See In re D.W.*, 791 N.W.2d 703, 708 (Iowa 2010).

We begin by asking what facts support the conclusion termination of Thomas's parental rights is in the best interest of the child. The State and dissent recite boilerplate case law regarding the child's need for permanency. However, neither identifies *the evidence* regarding the child's safety, health, or welfare suggesting the child would be better off being placed with someone other than his loving and caring biological father. Instead, both seem to place the burden on the father to establish why it is in the child's best interest to maintain the child-parent relationship. It is not his burden of proof; it is the State's.

The State has not established by clear and convincing evidence termination of this child's relationship with a caring father is in the child's best interests. It is undisputed Thomas can meet the physical needs of the child. Thomas has held steady, full-time employment. He has an appropriate and safe residence for the child. He has demonstrated the capacity to provide the items necessary for his care. Thomas also showed a concerted effort to provide for the emotional and social needs of the child. Thomas attended every visit with the child. The social worker testified the visits went well. As will be set forth in detail below, this is confirmed by contemporaneous records documenting the visitations. As set forth above, the State's own reports provide Thomas has a strong support network and can provide his son with a safe and appropriate home. Finally, Thomas is making a good faith effort to resolve his substance abuse and making progress in the effort. *See Karrie B. ex rel. Reep v. Catherine*

*J.*, 181 P.3d 177, 185–86 (Alaska 2008) (concluding it was proper to consider a parent's professed intent to change when declining to terminate parental rights).

In sum, the State failed to prove the second element of its case by clear and convincing evidence. The termination of the father's rights in the absence of such proof upsets the legislative scheme balancing the parent's rights against the State's duty to protect children within its borders. The termination order must be reversed on this ground as well.

C.

Finally, we consider whether termination under the circumstances achieves justice—that is, whether there are countervailing considerations that should serve to preclude termination of Thomas's parental rights even if the State had proved its case. We conclude the closeness of the parent-child relationship should serve to preclude termination under the circumstances. *See* Iowa Code § 232.116(3)(c).

The evidence shows two things: Thomas has a strong bond with the child, and Thomas provides excellent and loving care for the child. The guardian ad litem reports that "M.S. appears to be bonded with [the father] and often searched out [the father] while he was playing. M.S. appeared comfortable at [the father's] apartment." The FSRP reports are replete with contemporaneous entries documenting the good visits the father has with the child. For ease of reading, we have left the entries largely unedited:

> M.S. was very happy to see Thomas as he smiled. Thomas was equally just as happy to see him and picked him up out of the car seat. Thomas began holding him then set him down on the grown [sic] and played with him and watched him crawl for his toys and followed him around making sure he could play with his toys in a

safe environment. Thomas made sure that M.S. ate and that he also had a clean diaper.

Another report shows the following:

> M.S. was very happy to see Thomas he was smiling, kicking and reaching for Thomas. Thomas took him out of the car seat and hugged him and kissed him on the cheek he was happy to see M.S. Thomas asked provider the information about when M.S. was last changed and when he ate and had a bottle. . . Thomas began playing with M.S. and soothing him and holding him. Thomas was able to follow M.S.'s cues when he is crying. . . . Once M.S. woke up Thomas fed him some Jar food which he ate and made him a bottle which he had no issues with either. Thomas then changed him to ensure that he was dry and continued to play with him and some toys that Thomas purchased for him.

The provider reported a different visit:

> [M.S.] smiled when he seen [sic] Thomas; at the visit I observed Thomas fix [M.S.] a bottle for feeding time, after he was done eating Thomas burped M.S. and comforted him when he became fussy. Thomas interacted with M.S. with teething toys and tickling him while making funny sounds. Thomas also brought M.S. diapers for daycare . . .

The provider noted the following at a different visit:

> When Thomas arrived to the youth house he walked in and went straight to M.S. M.S. was very happy to see Thomas he smiled when Thomas went to get him out. Thomas and [his girlfriend] greeted M.S. and they were both happy to see him. They then placed him on the ground for tummy time and they took pillows and placed them all around the house so that they can block M.S. off so that he can't hurt himself.

In another entry:

> Thomas was prepared with the diaper bag. Thomas and [his girlfriend] let M.S. crawl around on the floor. They followed him and made sure he didn't crawl anywhere he could get hurt. M.S. was making babbling sounds and Thomas was mimicking him and trying to get him to say "daddy."

The provider reported the following from a different visit:

M.S. was very happy to see Thomas he started smiling and kicking his feet. Thomas smiled with him and picked him up and started playing with him. Thomas let him play in his jumper for a little while and then took him out of the jumper and played with him on the floor.

Another entry:

Thomas played with M.S. while he crawled around on the ground. Thomas was very protective of where he crawled to and what area's [sic] of the room he blocked off. Thomas fed M.S. and changed his diaper and made sure that he was dry.

On another visit, the provider noted:

When M.S. woke up he was happy to see Thomas. M.S. smiled and reach his hands up for Thomas to pick him up. Thomas picked him up and he was happy and jumping Thomas's arms. Thomas pulled out the toys to play with M.S. on the floor. . . [Thomas's girlfriend] went into the kitchen and made breakfast for them all. Thomas began to feed M.S. some pancakes and eggs.

On another visit:

Thomas welcomed M.S. with hugs and kisses and told M.S. that he loved him. During the visit Thomas feed M.S. a bottle of milk and gave him baby food, he also made sure M.S.'s diaper was changed. After M.S. ate Thomas burped him and rocked him in his arms until M.S. went to sleep. When M.S. woke up Thomas interacted with him with teething toys and toy balls, he also made funny noised while M.S. crawled around on the floor . . . When the visit was over Thomas put M.S in the car seat, kissed him and [said] to him that he loved him.

Although we have documented only a few entries in the interest of brevity, the record is replete with other entries and reports documenting similar interactions. We conclude termination of this father's parental rights under the circumstances presented fails to achieve justice.

IV.

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not

been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 U.S. at 753. "Termination is a drastic, final step, which improvidently employed can be fraught with danger. Termination must only occur where more harm is likely to befall the child by staying with his or her parents than by being permanently separated from them." *In re H.H.*, 528 N.W.2d 675, 677 (Iowa Ct. App. 1995). Thus, the spirit of assistance proceedings is to improve parenting skills and maintain the parent-child relationship rather than rush to terminate the parent-child relationship. *See In re H.L.B.R.*, 567 N.W.2d 675, 677 (Iowa Ct. App. 1997). Neither federal nor state law allows the State to terminate a parent's rights in pursuit of Skinnerian utopia. There is no authority that allows the State to terminate a parent-child relationship where the child loves the father, the father loves the child, the father can meet the physical and emotional needs of the child, and placement with the father poses no appreciable risk of adjudicatory harm to the child. This father is not perfect, but the law does not require perfection. We reverse the judgment of the juvenile court.

**REVERSED AND REMANDED.**

Potterfield, Doyle, Tabor, and Mullins, JJ., concur. Danilson, C.J., concurs specially. Vogel, Vaitheswaran, and Bower, JJ., dissent.

**DANILSON, Chief Judge.** (concurring specially).

I specially concur because I agree with the result but find it unnecessary to enter the fray on the issue of whether there is risk of an adjudicatory harm to the child. Rather, I conclude the State has failed to meet its burden of proof that the child was removed from the physical custody of the father as required by Iowa Code section 232.116(1)(h).

Here, the father raised as an issue the failure of the State to meet its burden with respect to Iowa Code section 232.116(1)(h). Upon our de novo review, we must find there "is clear and convincing evidence that the child cannot be returned to the custody of the child's parents." Iowa Code § 232.116(1)(h)(4). But the parents have never been married and it is undisputed that the child has never been in the custody of the father. *See In the Interest of B.L.*, 470 N.W.2d 343, 346 (Iowa 1991) (acknowledging that unless paternity is immediately admitted at birth, a father has no custody rights until a court order grants such rights as provided by Iowa Code section 675.40).

Our supreme court has interpreted the word "parents" to mean plural or singular by statutory construction and as provided by Iowa Code section 4.1(17). *In re Marriage of N.M.*, 491 N.W.2d 153, 155 (Iowa 1992).[2] This interpretation aids the State in this case in establishing the third element of Iowa code section 232.116(1)(h)(3) which requires proof the child was removed from the parents' home, or a parent's home, for at least six of the last twelve months, or for the last six consecutive months so long as any trial period has lasted less than thirty

---

[2] Iowa Code section 4.1(17) provides, "Unless otherwise specifically provided by law the singular includes the plural, and the plural includes the singular."

days. Because the child had been removed from the mother's care for this period of time, the State need not prove the child was removed from the father's home.

Nonetheless, the supreme court has not yet interpreted the fourth requirement in Iowa Code section 232.116(1)(h)(4) requiring proof "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided by section 232.102 at the present time." Iowa Code § 232.116(1)(h)(4). Certainly the father cannot defend with evidence that the mother is able to have the child returned to her. *See In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005) (stating that one parent cannot assert facts or legal positions pertaining to the other parent). And because the father never had custody, the child was never removed from his care and custody cannot be "returned" to him. Under our facts, to find clear and convincing evidence of this fourth requirement, the word "returned" must either be ignored or interpreted to encompass the situation where custody cannot be "awarded" to the father. Until our supreme court addresses this issue, I decline to adopt such an interpretation and conclude the State has failed to meet its burden of proving the fourth element or requirement of Iowa Code section 232.116(1)(h).[3]

---

[3] When custody is removed from a parent there is also an obligation to warn the parent of the potential of termination of parental rights, a warning not necessarily afforded to a noncustodial parent. *See* Iowa Code § 232.102(8). Other alternatives to terminate parental rights are available to the State under Iowa Code section 232.116(1). *See In re C.F.-H.*, No. 16-0918, 2016 WL 4379340 (Iowa Ct. App. Aug. 17, 2016) (Danilson, C.J., dissenting).

**VOGEL, Judge.** (dissenting).

Because I agree with the district court's decision to terminate Thomas's parental rights to M.S., I dissent from the majority opinion. I conclude the State offered sufficient evidence to prove the child could not be returned to Thomas's care at the time of the termination hearing due to his failure to abstain from controlled substances coupled with his history of anger management problems.

M.S., the child at issue, came to the attention of the Iowa Department of Human Services (DHS) when he tested positive for THC at birth in June of 2015. While the mother initially informed the DHS that another man was the father of the child, Thomas knew of his status as the child's father during the early stages of the pregnancy and contacted the mother a few days before M.S.'s birth, asking to see the child. Thomas was aware of the DHS's involvement with M.S. but did not reach out to the DHS until he was contacted by letter in November 2015. When Thomas was first identified as M.S.'s father, M.S. could not be placed with him without the risk of suffering adjudicatory harm. Thomas was told he needed to remove the risk factors before he could move forward with unsupervised visitation and eventual placement of the child in his care. Those expectations included: Thomas abstaining from using drugs, complying with random drug testing, working on his life stressors, and following through on individual counseling and recommendations. The goal was for M.S. to "live in a safe and stable environment, free from illegal substances, with caretakers who are clean, sober and maintaining the stability of their mental health."

**I. Marijuana Use.**

From the initial conversations between the DHS and Thomas in December 2015, even before his paternity of M.S. was confirmed by the DHS, Thomas was aware of his need to provide two clean drug screens in order to move beyond fully supervised visitation with M.S. As of the time of the termination hearing in May 2016, he had utterly failed to comply with this directive. Thomas was open about his long-time use of cannabis, including marijuana and cannabis oils. He testified he began using controlled substances when he was twelve, stopped using them only while in a juvenile residential treatment facility, and admitted to daily use of marijuana after that stay. He has tried and failed three times in the past to complete drug treatment programs. He also admitted using at least three times during the course of the child-in-need-of-assistance proceeding.

While Thomas appeared to be honest and open about his marijuana use, the drug screen test results belie Thomas's contention that he had reduced his marijuana consumption from daily usage when this case started to only the occasional use. Thomas's hair stat test in December 2015 was "probably one of the highest the Department has seen for marijuana" at 17.63 pg/mg. The screening cut-off for a positive test is 1.0 pg/mg. In February, two months after the first test and after being informed of the steps necessary for him to gain custody of M.S., Thomas's test results were almost as high as it had been in late December: 17.02 pg/mg. Despite this startlingly high result, Thomas claimed to have only used once in those two months after a stressful family team meeting in mid-January. The hair stat test on May 5 showed a reduced, but still very high,

level of 11.39 pg/mg, in spite of Thomas's claim that the last time he used was a month earlier on April 6.

The urine analysis test results also do not show a decrease in usage over the course of these proceedings.[4] A test given on April 26 showed a level of THC of 113. A test given two weeks later on May 10 showed a level of THC of 244. The screening cutoff for these tests is 50. Thomas had no explanation as to why the level would increase so dramatically in two weeks when he claimed he last used on April 6. His only explanation was his admission that he used a "detox kit" before the April 26 test. Thomas admitted he used the kit to "essentially mask whether or not THC [was] in [his] system." Even Thomas admitted he had not made any substantial progress towards sustained sobriety in the five months he had been involved in services.

**II. Life Stressors.**

Of particular concern is Thomas's concession that he uses marijuana to help cope with stress. He admitted using marijuana following a confrontational family team meeting in January. He admitted using marijuana in March when his mother kicked him out of her house because of a fight they were having. He also admitted using marijuana on April 6 after learning of the murder of a good friend.

The DHS worker remained concerned that raising a child is a stressful endeavor and that if Thomas became stressed he may turn to his coping

---

[4] The record in this case indicates Thomas had positive urine drug screens on February 18, March 23, April 26, April 27, and May 10. The only negative test came on February 14, but the DHS worker indicated she doubted the accuracy of that negative test in light of Thomas's admissions as to when he last used and the positive test result that occurred four days later. The test result for March 23 indicated a level of THC above 500; the test on April 26 indicated a level of 113; the test the next day on April 27 indicated a level of 306; and the test on May 10 indicated a level of 244.

mechanism—marijuana—while caring for M.S. and when not under the watchful eye of the DHS representative. As noted by the DHS worker, Thomas "has a lengthy history with the substance, and it is an illegal, mind-altering substance." And while the DHS worker had not seen him use drugs during a supervised visit, all she and this court can glean from this record is Thomas's continued use based on the positive drug tests.

### III. Anger Management.

Besides the continued marijuana use, DHS also had concerns about Thomas's anger management. As mentioned above, at the termination hearing, Thomas admitted to escalating an interaction at a family team meeting in January. After which he admitted using marijuana to help him cope with the stress. In February, the DHS worker arrived at Thomas's mother's house with M.S. for a supervised visit. Thomas had not been informed of the visit due to a miscommunication and had to be awakened to exercise his visitation. With the child present, Thomas let his frustration and anger at the miscommunication be known to all present. The DHS worker testified Thomas was "very frustrated," "very agitated," and "became very argumentative and defensive." It was "pretty hard to be able to calm him down." Thomas's family had to assist for thirty to forty-five minutes to try to calm him down. The DHS worker made it clear that if Thomas would not calm down, she would end the visit with M.S. "because it was not an appropriate environment for [the child] to be in with [the] father that upset."

A month later in the middle of March, Thomas's mother kicked him out of her house due to a conflict between the two, resulting in Thomas having to live on friends' couches for a month before he was able to obtain housing for himself.

Again, due to the stress with his mother, Thomas admitted he used marijuana to cope with the situation. Thomas's anger problems long predate M.S.'s birth. For example, just one year before M.S.'s birth, Thomas was arrested and spent forty days in jail as a result of a physical altercation with his father. He admitted at the time of the fight, he was consuming alcohol. Thomas's mother related to the DHS that Thomas "has always had anger issues and can go from 0 to 90 in a matter of seconds when provoked." Thomas agreed with his mother's assessment.

## VI. Analysis.

**A. Statutory Grounds for Termination.** While Thomas was participating in anger-management counseling at the time of the termination hearing and was making some progress, Thomas's pattern throughout this case has been to lash out in anger and frustration when conditions are placed on him. To cope, he turns to marijuana use. Thomas did comply in part with the DHS case plan by maintaining employment and providing adequate housing, even after he was kicked out of his mother's house. But despite this minimal progress, I would find termination is appropriate pursuant to section 232.116(1)(h), which requires, in part, the State to produce "clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(h)(4). "[A] child cannot be returned to the custody of the child's parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992).

The time for determining whether a child can be returned to a parent's custody is the time of the termination hearing. *See In re M.W.,* 876 N.W.2d 212, 223–24 (Iowa 2016) ("Finally, there is clear and convincing evidence in the record that *at the time of the termination hearing*, the children could not be safely returned to the custody of R.W. . . . Upon our de novo review, we conclude that there is clear and convincing evidence in the record that the children could not safely be returned to the custody of R.W. under Iowa Code section 232.102 *at the time of the termination hearing.*" (emphasis added)). As noted, Thomas admitted there had not been "any substantial progress towards sustained sobriety" and admitted the child could not be "fully returned to him today." He conceded he would require "some unsupervised and overnight visits first," a request the DHS employee did not recall him making at earlier stages of the proceedings. It was clear to the DHS that M.S. could not be returned to Thomas's custody at the time. M.S. has never been in Thomas's custody since birth and has never been cared for by Thomas in an unsupervised setting. Despite five months of services, Thomas has been unable to progress beyond supervised visitation with M.S. due to his continued use of marijuana and cannabis oil. His attempts to address his anger problems remain a work in progress. While the DHS casework did not have safety concerns during Thomas's supervised visitation, there has never been a time when his care of M.S. has not been fully supervised by the DHS. Thomas himself testified the child could not be returned to his care at the present time. M.S. is just as likely to suffer an adjudicatory harm at the time of the termination hearing as he would

have been if he had been placed in Thomas's care the moment DHS became aware of his paternity.

This is not a case where another relative has offered to assist an addicted parent unable to care for the child. *Cf. In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014). Thomas continues to claim he has abstained from marijuana use in the face of test results that tell a very different story. He has not shown he could provide a drug-free home for M.S.; he has no plan in place for M.S. to be cared for when he is using marijuana; he has no plan in place for handling stress, including the stress of caring for a very young child, other than turning to his standard coping mechanism, his drug of choice—marijuana. *See id.* (noting the children at issue had a grandparent who was willing and able to step in and relieve the drug-addicted mother of her parenting duties when the mother "was not up to the task").

After five months of services, Thomas has only made minimal progress, leaving this child imminently likely to suffer adjudicatory harm if returned to this parent's care. *See* Iowa Code § 232.2(6)(c)(2), (n), (o); *see also id.* § 232.116(2) (requiring consideration of child's safety and physical, mental, and emotional condition and needs). "Child protection statutes 'are designed to prevent probable harm to the child and do not require delay until after harm has occurred.'" *J.S.*, 846 N.W.2d at 43 (quoting *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990)). Moreover, as is repeatedly cited in our case law, Thomas has chosen to put his needs ahead of this child's needs. *In re J.L.W.*, 570 N.W.2d 778, 781 (Iowa Ct. App. 1997) ("At some point, the rights and needs of the child rise above the rights and needs of the parents."), *overruled on other grounds by*

*In re P.L.*, 778 N.W.2d 33 (Iowa 2010).  By refusing to provide two clean drug-tests, Thomas has continued to demonstrate his drug use is more important than providing a drug-free environment for his child.  This, coupled with his ongoing anger management, continues to paint a picture where M.S. would be at risk of adjudicatory harm if placed in his care.  "Where the parent has been unable to rise above the addiction and experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting."  *In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998).

B. **Six-Month Extension.**  Thomas, admitting the child cannot be in his care at the present time, requests a six-month extension of time to work toward reunification.  *See* Iowa Code § 232.104(2)(b).  To grant such an extension, the court must be able to enumerate specific factors or expected behavioral changes that show the need for removal will no longer exist at the end of the additional six months.  *Id.*  A three-month extension was already granted to Thomas, and I agree with the district court an additional extension is not warranted here.  What progress Thomas has made has been tentative at best and does not indicate the need for removal will no longer exist in six months.  *See In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005).

C. **Impediments to Termination and Best Interests.**  Thomas also contends his rights should not be terminated because of the closeness of the parent-child relationship.  *See* Iowa Code § 232.116(3)(c).  The statutory factors weighing against termination are permissive, not mandatory.  *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011).  The court has discretion, based on

the unique circumstances of each case and the best interests of the child, to apply the factors in section 232.116(3) to save the parent-child relationship. *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

Under the circumstances, I conclude the permissive exception cannot serve to preclude termination. Thomas knew he was this child's father when the mother became pregnant. Thomas took no action to become involved in the child's life until the DHS contacted him. Since then, Thomas's only interactions with this young child have been supervised visits of brief duration, and he had not even requested his supervised visitations be increased or asked the DHS to progress beyond supervised visitation as of the time of the termination hearing. Moreover, my consideration of this child's best interests militates against invoking this permissive exception. *See* Iowa Code § 232.116(2). The child is not placed in foster care but placed in the maternal grandparents' home, who have expressed a desire and willingness to adopt M.S. I would affirm the termination of Thomas's parental rights.

Vaitheswaran and Bower, JJ. join this dissent.