# IN THE COURT OF APPEALS OF IOWA

No. 19-0090
Filed April 3, 2019

**IN THE INTEREST OF K.R. and K.R.,**
**Minor Children,**

**A.J., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Rachael E. Seymour, District Associate Judge.

The mother appeals the termination of her parental rights to her children.

**REVERSED AND REMANDED.**

Zachary C. Priebe of Jeff Carter Law Offices, PC, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Paul L. White of Juvenile Public Defender's Office, Des Moines, attorney and guardian ad litem for minor children.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

The mother appeals the termination of her parental rights to her children, born in April 2017.[1]  The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(e) and (h) (2018).  The mother maintains the State did not prove the statutory grounds for termination by clear and convincing evidence, termination is not in the children's best interests, and a permissive factor weighs against termination.  Alternatively, she requests a six-month extension to continue working toward reunification with her children.  We find it necessary to address only the final issue.  *See In re R.M.*, No. 12-1886, 2013 WL 264326, at *1 (Iowa Ct. App. Jan. 24, 2013) (declining to consider the section 232.116 three-step analysis for termination of parental rights when the court determined an extension of time was appropriate).

The family originally came to the attention of the Iowa Department of Human Services (DHS) in October 2017, due to the father physically assaulting the mother in the presence of the twins.  The father was subsequently arrested for domestic assault and pled guilty to the charge.  The mother, who was still a minor, agreed to a safety plan that included not allowing the children to be in the care of the father.  Then, in January 2018, the mother became overwhelmed and left the twins in the care of the paternal grandparents—the home in which the teenage father resided when he was not incarcerated.  The mother's whereabouts were unknown for approximately two weeks, during which time the father had access to the children and the paternal grandparents proved unable to

---

[1] The parental rights of the children's father were also terminated.  He does not appeal.

care for the young children. As a result, the children were removed from the mother's care in February 2018.

For several months after the children were removed, the mother lacked stability. In its removal order, the juvenile court noted the mother had made a choice not to live with the maternal grandmother and instead stayed with friends. But when the young mother asked the court to place the children in the care of maternal grandmother, the court denied the request, stating in its written order:

> Mother also admitted her sister is currently involved in Juvenile Court Services and is living in the Des Moines area, but not in the grandmother's home. DHS has explored this placement and has found it to not be appropriate, in addition to Grandmother's children not being in her care, [the maternal grandmother's live-in paramour] and his children were Juvenile Court involved. [The maternal grandmother] testified in this matter. She admitted . . . she did not believe the No Contact Order was necessary [between the mother and father] as the parents had just got caught up in some "silly stuff." . . . Grandmother continued to state she does not believe [the father] is not [sic] a safety concern for Mother or the children.

During the same time period, the mother was open with the court about the several instances of domestic violence the father perpetrated against her, including a time while she was pregnant when the father poured lighter fluid on her and threatened to light her on fire. Still, the mother was slow to begin participating in services meant to help her identify unhealthy relationships and process the incidents that occurred with the father. Some of the delay may be attributed to the mother's age, as when she tried to set up some services for herself, she was told that, as a minor, she needed a parent to come with her; the maternal grandmother's work schedule made it difficult for her to attend services with the mother.

At the time of the first day of the termination trial, on September 25, 2018, the mother had obtained her own housing through a transitional living program for young mothers. The housing was appropriate, as DHS approved the mother having visits with the children in the home. Additionally, the living program provided additional support for the mother, helping her set goals and then following up with her on her progress. The ultimate aim of the program was to help mothers become self-sufficient. The mother was attending an alternative high school and planned to graduate in May 2019. She had obtained a part-time job and was seeing a therapist regularly. The mother recognized she had been a victim of domestic violence and testified she was continuing to learn what a healthy relationship looks like and red flags for unhealthy relationships. Both the mother and the father testified they are no longer in a relationship, and no evidence was offered to contradict their testimony. At trial, the mother admitted into evidence letters from professionals she worked with, including a parenting and life skills specialist who outlined some of the programs in which the mother participated. Additionally, the specialist stated:

> I have personally been working with [the mother] since October of 2017 and have seen great improvements in multiple areas. She is now attending school every day and is actively involved with the resources that are offered at [her alternative school]. [The mother's] attitude has also improved, and her mood has gotten brighter. [The mother] utilized my coworkers and I to obtain housing at the Lighthouse. Now that she has stable housing, her school attendance is now regular. [The mother] is now working as well. While working with [the mother] I have seen her grow as a mother. She asks questions if she is unsure of a parenting situation and works really hard to plan snacks and meals for her sons before visits. [The mother] talks about her sons and is helpful to mothers of younger children in our program when discussing milestones.

The mother also admitted into evidence a letter from a supervisor at her school, who opined that the mother had "grown so much in the last six months," noted the mother's eagerness "to learn more about being a great mother and person," and indicated the mother was on track to graduate in May 2019. At the close of the termination trial, the children's guardian ad litem asked the court to grant the mother a six-month extension to work toward reunification.

It appears the mother's ability to participate in the transitional living program—which provided her an appropriate, stable home for the first time during the proceedings—allowed the mother to begin making great strides. We understand the juvenile court's concern that at the time of the termination hearing, the mother had only exhibited stability for a short time, but the mother testified she was eligible to remain in the housing program for two years, and she seemed committed to the program. Additionally, while we share the juvenile court's concern regarding the mother's minimization of the father's violent behavior when she testified at the termination trial, we do not believe these statements alone establish that the mother is unable to keep the children safe from dangerous individuals. The mother admitted she is still working on recognizing healthy relationships and processing her previous experiences. It is undisputed the mother and father are no longer in a relationship, and there was no evidence of any other unsafe individuals in the mother's life.

We agree the children could not be returned to the mother's care at the time of the termination hearing, as the mother's stability and progress were recent and she needed additional time to continue working on domestic-violence issues, but an additional six months will provide the mother with the time she

needs to show she can safely parent these children on her own.[2]  *See* Iowa Code § 232.104(2)(b).  We reverse the juvenile court's termination of the mother's parental rights and remand for implementation of a six-month extension.

**REVERSED AND REMANDED.**

---

[2] We recognize the evidence in the record—including the mother's own admissions—that she chose to smoke marijuana at times during the pendency of these proceedings when the children were not in her care.  While we expect the mother will maintain her recent drug-free lifestyle, we note that the use of drugs alone is not grounds for termination of parental rights.  *See In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016) (reversing termination of parental rights, which was based on father's use of marijuana, because "the mere fact of use does not establish adjudicatory harm"); *see also In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) (holding the mother's methamphetamine use, in and of itself, did not constitute adjudicatory harm).