**IN THE COURT OF APPEALS OF IOWA**

No. 20-0854
Filed September 2, 2020

**IN THE INTEREST OF J.H.,**
**Minor Child,**

**J.H., Father,**
Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

A father appeals the termination of his parental rights to his child. **REVERSED AND REMANDED.**

Alexandra M. Nelissen of Advocate Law, PLLC, Clive, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Nicole Garbis Nolan of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

Considered by Doyle, P.J., and Mullins and Greer, JJ.

**MULLINS, Judge.**

J.H.'s parents have a long history of involvement with the Iowa Department of Human Services (DHS). Over several years, the parents have had their parental rights terminated as to nine children they share. The parents have also had their rights terminated as to children from other relationships. The family again came to the attention of DHS shortly after J.H.'s birth in April 2019.[1] The concerns noted included the mother's intellectual disability, substance-abuse and mental-health issues, and propensity for violence, as well as the father's history of substance abuse and domestic violence. The child was temporarily removed from the parents' care and was placed with paternal relatives under DHS supervision. The child was adjudicated in need of assistance pursuant to Iowa Code section 232.2(6)(c)(2) and (n) (2019).

In July, the father began participating in mental-health therapy. According to the father's therapist, he gained insight into his issues with domestic violence and began taking accountability for his actions. The father and his therapist also frequently visited about the father's long history of substance abuse. At the ultimate termination hearing, the therapist testified to his position that the father was not abusing substances since he began treatment and that the father has gained an understanding of how substance abuse affected everything in his life. The therapist stated he harbored no concerns as to the father's mental health, substance abuse, or safety.[2]

---

[1] The parents' rights had recently been terminated as to three other children.
[2] The mother, with whom the father continues to reside, also began therapy in July. The mother's therapist testified at the termination hearing that she has gained insight into her poor decision making and anger issues and how they affect her

In October, the State petitioned for termination of the parents' parental rights. Following a termination hearing held over three days in February and March 2020, the court terminated the parents' rights pursuant to Iowa Code section 232.116(1)(g).

The father appeals.[3] He challenges the sufficiency of evidence supporting the statutory ground for termination and argues termination is contrary to the child's best interests.[4] Our review is de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). Our primary consideration is the best interests of the child, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the child's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

Section 232.116(1)(g) allows for termination of parental rights upon clear and convincing evidence of the following elements:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family or a court of competent jurisdiction in another state has entered an order involuntarily terminating parental rights with respect to another child who is a member of the same family.
> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.
> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

---

ability to be an appropriate parent. However, the therapist agreed the mother would need accommodations in order to provide appropriate care for a child.

[3] The mother filed an untimely notice of appeal and the supreme court dismissed the appeal for lack of jurisdiction.

[4] The father also passively suggests, "It is clear from the evidence submitted at Trial that the Court should have found reason not to terminate under the exceptions found in Iowa Code Section 232.116(3)(b) and (c)."

On appeal, the father challenges the State's establishment of the third and fourth elements.

Unquestionable is the fact that the father has long histories of substance-abuse, mental-health deficiencies, and domestic violence. Also unquestionable is the fact that, in prior child-welfare cases as to the father's other children, he demonstrated a lack of ability or willingness to respond to services that would correct the situation and additional time would not correct the situation. But here, the father responded to and meaningfully participated in services. As a result, the initial concerns precipitating removal as to the father—"his significant history of substance abuse and domestic violence"—dissipated and did not re-arise. While we agree with the State that there were other concerns, namely the father's cognitive functioning and his ability to attend to the child's medical needs[5] as well as his own medical needs, the State carries the burden to prove by clear and convincing evidence that the father "continues to lack the ability or willingness to respond to services which would correct the situation." Iowa Code § 232.96, .116(1)(g); *In re M.S.,* 889 N.W.2d 675, 679 (Iowa Ct. App. 2016).

> Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. It is the highest evidentiary burden in civil cases. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence.

*Id.* This heavy evidentiary burden is imposed "to minimize the risk of an erroneous deprivation of the parent's fundamental liberty interest in raising his [or her] child."

---

[5] The child has an eye condition, severe congenital glaucoma, which the parents have not familiarized themselves with or made an attempt to gain an understanding of, and the parents struggle to attend medical appointments and understand the child's medical needs.

*Id.* "We therefor cannot rubber stamp what has come before; it is our task to ensure the State has come forth with the quantum and quality of evidence necessary to prove each of the elements of its case." *Id.*

Here, different from the prior child-welfare cases, the father did respond to services. He overcame his substance-abuse and domestic-violence issues and there were no concerns for his ability to parent the child during supervised visitations. Upon our de novo review and drawing from the evidence, we have serious doubts as to the conclusion that the father "continues to lack the ability or willingness to respond to services which would correct the situation." Iowa Code § 232.116(1)(g). As such, we conclude the State failed to meet its burden for termination. We reverse the termination of the father's parental rights and remand for dismissal of the termination petition as to him.[6] *See id.* § 232.117(2); *In re J.L.*, 868 N.W.2d 462, 468 (Iowa Ct. App. 2015). We have no jurisdiction to interfere with the termination of the mother's parental rights.

**REVERSED AND REMANDED.**

Doyle, P.J., concurs; Greer, J., dissents.

---

[6] The State's initial termination petition alleged section 232.116(1)(g) as the sole ground for termination. Thereafter, the State filed an amended and substituted petition adding section 232.116(1)(h) as an additional ground for termination. The court only terminated the father's parental rights under paragraph (g). The supreme court has clarified the State does not need to file a cross-appeal in order "to *assert* an alternative ground for affirmance on appeal that was raised before the juvenile court." *In re M.W.*, 876 N.W.2d 212, 221 (Iowa 2016) (emphasis added). However, we have declined to consider affirming on alternative grounds when the State does not ask us to on appeal. *See In re R.T.*, No. 17-1036, 2017 WL 4050995, at *2, n.5 (Iowa Ct. App. Sept. 13, 2017). Likewise, here we decline to consider an alternative ground which the State has not asserted, as it is not our role to advocate for termination under paragraph (h) on the State's behalf. *See, e.g.*, *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974).

**GREER, Judge** (dissenting)

I respectfully dissent. I would affirm the juvenile court decision to terminate the father's parental rights. The majority believes the State failed to meet its burden. I agree that the State had to show by clear and convincing evidence that the father lacked the ability or willingness to respond to services that would correct the situation inhibiting his ability to care for his child. I believe the State showed by clear and convincing evidence that this father was unable to provide a safe long-term environment for this child. The tipping point for me is the lack of involvement in the basic medical care of this young child.

First of all, the father has been involved with the Iowa Department of Human Services (DHS) for number of years. In the termination order, the juvenile court chronicled the history beginning in 2008. It is chaotic to say the least. But importantly, the past is a great predictor of the future. *See, e.g.*, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). The earliest issues impeding this father's ability to care for the child revolved around the father's substance abuse, his propensity to engage in domestic assault, and his general inability to address daily care for his children. The juvenile court also referenced the father's intellectual limitations that impact his care of J.H. We all acknowledge, and my colleagues find compelling, that the father made strides in therapy to gain insight into actions involving his domestic violence and his substance abuse. While those problems contributed to the overall dysfunction impacting an ability to parent, the State demonstrated other unaddressed concerns. And although the father was offered many services and support for many, many years, those concerns continue to impact the care and safety of this father's child.

At the advice of church friends who easily manipulated the father for money, the father opted to not visit the child or participate with the DHS or other professionals attempting to reunite the family. That included a decision by the father to not attend visitations for about six weeks at the advice of these friends.[7] His lack of improvement and insight into his parenting skills were strikingly evident in this simple exchange at trial:

> Q. Okay. So the Department—and you're the father of all nine of those; right? A. Yes.
> Q. So you've had—you've had DHS involvement for all of those children; right? A. If it's all of them, if that's what it says, it's what it says.
> Q. Okay. So why, after that many children, were you unable to make the choice that was right for [J.H.] and to visit him? A. I don't know.

When this child was born, DHS removed the child, and the father has not had the child in his care since birth. And even before birth, neither parent saw that the mother received prenatal care. Shortly after birth, J.H. was diagnosed with congenital glaucoma and the doctors confirmed if the congenital condition is not managed appropriately with medications and surgery the child is at risk for permanent blindness. The medical providers emphasized that follow-up care and treatment was essential. The doctor noted "it is imperative that [J.H.] remain under direct supervision of his foster caretakers . . . to ensure proper medication compliance, appropriate eye hygiene, and healing in the post- and pre-operative period." J.H. has a life-long medical condition.

---

[7] From April 25, 2019, after removal of J.H. from the father's custody until June 5, 2019, the father opted out of visits.

In the past proceedings, the court noted that the father "needs to learn to care for a child's daily needs on a long-term basis." The concern continues to this date. With the child this young who has serious health concerns, it is particularly concerning. First, the father could not find a way to attend any of the medical appointments for this child. He did not know any of the medical providers' names. He did not go to Iowa City for any of the surgeries the child had involving the congenital glaucoma. He was unaware of the care needed for J.H.'s condition. He did not know what surgeries the child had and had no idea how many surgeries the child had but testified that if the child was sent home he was sure that he could get the information.[8] This lack of interest and follow-through occurred even though the father had access to a medical transport, gas cards, bus passes, and a friend who testified that she would have taken the father if he asked.

And unlike *In re M.S.*, which the majority cites to explain the burden of proof, here the father purposely stopped visits with the infant child when bonding is so essential. 889 N.W.2d 675, 683 (Iowa Ct. App. 2016). The father failed in every respect to be informed, engaged, and involved in the child's significant medical situation. The juvenile court noted this was not the first time the father avoided the health care needs of his children. In 2017, when his twins, born with cocaine in their cord blood, needed regular doctor appointments and physical therapy, this father did not regularly attend that treatment and could not articulate the special needs of those children.[9] And we look past the promises of the father to see what

---

[8] From August to September 2019, J.H. underwent multiple surgeries for his eyes. The father never visited the child and never contacted the medical personnel regarding the health needs, services, or future treatment.

[9] The father's parental rights to these twins were terminated in another proceeding.

his actions support. The lack of interest in the medical conditions of J.H. relates directly to the safe care of the child. "When we consider whether parental rights should be terminated, we 'shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.'" *In re M.W.,* 876 N.W.2d 212, 224 (Iowa 2016) (quoting Iowa Code § 232.116(2)).

Yet, the majority asserts there were no concerns with the father's ability to parent[10] while in the most important issue for J.H.—the basic health care and the ability to see—this father checked out. This behavior is the action, or lack thereof, that supports the termination of this father's rights. There was also some testimony about the father providing the wrong formula for the child, and he was unable to operate the car seat safely. The father often bucked the family safety, risk, and permanency provider's recommendations for safe care of the infant. But overall the greatest concern is the lack of interest and the inattention to the medical concerns of the child that impacted the ability to provide a safe environment for such a young child.

Knowing that the district court has the ability to see witnesses and make assessments and that the father gave his counselor untruthful information about his substance use, I would affirm the juvenile court ruling. "[A] child cannot be returned to the custody of the child's parent under section 232.102 if by doing so

---

[10] Progress reports in October 2019, referenced the father appeared not to fully engage or help with J.H.'s needs and was upset when visits were cancelled because of J.H.'s significant medical needs.

the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.,* 483 N.W.2d 812, 814 (Iowa 1992).