# IN THE COURT OF APPEALS OF IOWA

No. 18-2028
Filed February 20, 2019

**IN THE INTEREST OF W.D., A.D., F.D., Z.D., and S.D.,**
**Minor Children,**

**W.D., Sr., Father,**
    Appellant.
_____

    Appeal from the Iowa District Court for Winneshiek County, Linnea M. N.

Nicol, District Associate Judge.

    A father appeals the termination of his parental rights to his five children.

**AFFIRMED.**

    Karl G. Knudson, Decorah, for appellant father.

    Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney

General, for appellee State.

    Whitney L. Gessner of Gessner Law Office, Monona, guardian ad litem for

minor children.

    Considered by Doyle, P.J., and Mullins and McDonald, JJ.

**DOYLE, Presiding Judge.**

A father appeals the termination of his parental rights to his five children.[1] Upon our de novo review, we affirm.

### *I. Standard of Review and Statutory Framework.*

Under Iowa Code chapter 232 (2018), parental rights may be terminated if the following three conditions are true: (1) a "ground for termination under section 232.116(1) has been established" by clear and convincing evidence, (2) "the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights," and (3) none of the "exceptions in section 232.116(3) apply to preclude termination of parental rights." *In re A.S.*, 906 N.W.2d 467, 472-73 (Iowa 2018). Our review is de novo, which means we give the juvenile court's findings of fact weight, especially the court's credibility assessments, but we are not bound by those findings. *See id.* at 472. "For evidence to be 'clear and convincing,' it is merely necessary that there be no serious or substantial doubt about the correctness of the conclusion drawn from it." *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct. App. 1983); *see also In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

### *II. Background Facts and Proceedings.*

W.D. is the father and K.D. is the mother of five children, all of whom were born before 2013. The parents were married in or about 2005, and their oldest child was born in March 2006. In October 2006, the Iowa Department of Human Services (DHS) received a report of child abuse allegedly perpetrated by the father

---

[1] Though the mother filed a notice of appeal, her petition on appeal was untimely and consequently dismissed by our supreme court. Therefore, she is not part of this appeal.

against the infant. The DHS determined the report that the father denied the infant critical care in failing to provide proper supervision was founded.

In January 2013, the family again came to the attention of the DHS after it received reports of child abuse. Following a DHS assessment, the reports against both parents for denying their children critical care in failing to provide proper supervision were determined to be founded. Services were offered to the family, and the case was closed in the late summer or early fall of 2013.

In August 2013, the DHS received a report that the family was living in an RV-type home, a fifth-wheel trailer that was not suitable for children.

> The parents and [five] children were residing in [a] camper at a relative's home. Law enforcement [officials] observed piles of garbage on [the] floor of the camper, animal feces accessible to the children, food items on the floor, dirty dishes and piles on the floor leaving it difficult for the children to maneuver through the items. Through the assessment . . . it was discovered that there were many concerns with the parents' parenting ability.

At the conclusion of the assessment, the DHS found the new reports against the parents for denying their children critical care in failing to provide adequate housing were founded. Services were again offered to the family. The DHS has continued to be involved with the family since that time.

After the August 2013 report, the family moved in with the father's mother and her husband. In October 2013, it was alleged the father kicked one of the children in the shin causing a bruise, but the report was not confirmed. There were other concerns about the father's anger and aggression, including that he was making threatening statements towards the children's school. The mother and the children then moved into a new place, and the father continued to live with his mother. The parents have remained separated.

In November 2013, it was relayed to the DHS that the mother reported "inappropriate sexual contact between the children." The mother told the DHS worker that the parents' four-year-old "daughter had come out of the bathroom prior to a visit with [the father] and asked if [the father] was going to touch her anymore and grabbed her private area." The mother set up counseling appointments for the children, and the children were interviewed at the child protection center. Following protective interviews, the professionals did not find the information obtained from the children was congruous; the children were not able to give any details and appeared to be reporting things that they had heard. The report of sexual abuse was not confirmed.

In January 2014, the DHS received another allegation the father had sexually abused a relative. In that instance, the father's minor nephew reported the father had touched the nephew "on the private part of his body" on top of his pants. This report of sexual abuse was determined to be founded, and the case was referred for criminal prosecution. Thereafter, the DHS suggested the father participate in a "psycho-sexual evaluation to determine risk of re-offense, risk to the children, and if any treatment is recommended." The DHS stated the visitation with his children would remain supervised minimally until the father was evaluated, and, if the father did not participate, "the visitation [would] stay supervised long-term." The juvenile court in its October 2014 dispositional order adopted the DHS's case plan, including the recommendation that the father participate in the psycho-sexual evaluation. The father refused to participate "until he [was] either officially charged or the charges [were] dropped." The father did continue to have

supervised visits with the children every other weekend, and those visits were without any incident.

The father was charged with indecent contact with a child relating to the allegations by his nephew in March 2014. The case was ultimately "resolved with a plea to the lesser included charge of assault for which the children's father was sentenced to ten days in jail on June 23, 2015." The father then "agreed to participate in a psycho-sexual evaluation." At the time of the September 2015 discretionary-review hearing, the father had an evaluation scheduled for November of 2015, and the court allowed the frequency of the father's supervised visits to be increased.

A discretionary-review hearing was held in April 2016, and the court entered an order thereafter continuing the child-in-need-of-assistance (CINA) matter. The court indicated the father had participated in the evaluation as directed, stating:

> The children's father participated in a psycho-sexual evaluation . . . due to there being a founded child abuse report concerning a relative child as the victim. [The parents' oldest child] has made repeated reports of sex abuse against his father and concerns were raised that the child was coaching his siblings as to what to report, although the other children have not been good reporters as to what happened. The children's father is diagnosed with major depressive disorder (recurrent, severe with psychotic features), intermittent explosive disorder, alcohol dependence in partial remission, and schizoid and paranoid personality disorders. It remains strongly recommended that his contact with his children continues to be supervised by a third party until such time as the counselors for the children and their father recommend that relatives be considered. It is also recommended that the children's father have a psychiatric evaluation to determine if medication is appropriate for his psychiatric disorders and that he engage in individual counseling to include dealing with his sexuality, family therapy, co-parenting and joint therapy with the children. He will attempt to obtain services . . . as well as participate in [Family Safety, Risk and Permanency (FSRP)] services and the children's play therapy.

The children remained in the mother's care, and a review hearing was scheduled for October 2016.

Prior to the scheduled review hearing, the DHS filed an application for removal of the children from the mother's care. The application stated the children had continued to act out sexually, either as a perpetrator of sexual abuse or as the victim of his or her sibling's sexual abuse. The application alleged the mother's failure to properly supervise the children prevented the mother from stopping the actions from taking place and allowed the children the opportunity to perpetrate abuse on each other. The application further stated the father's whereabouts at that time were

> unknown. He was participating in DHS services and he had been in communication with [the DHS social worker] in the month of August. Since then, his cell phone number has been disconnected, he has not participated in FSRP services, he has missed supervised visitation with his children, and correspondence has been returned to DHS unopened.

The children were removed from the mother's care, and the children could not be placed in the father's care. Because the children were abusing each other and it was recommended each child have a separate sleeping arrangement, the two oldest boys were placed together in one foster home, the two girls were placed together in another foster home, and the other child was placed in the care of his paternal grandmother. Additionally, because "the children had been much more open during [their most recent] interview [with the DHS protective worker] than ever before during a number of prior child protective assessments," the court directed the children be re-interviewed at the child protection center "to get to the

reason(s) why the children were sexually active" and to hopefully prevent the behaviors from reoccurring.

Following a hearing, the court subsequently modified the dispositional order to continue the children's removal from the parents' care and their placement in foster care. The court noted three of the children were receiving play therapy, and their therapist reported the children continued "to claim that they were sexually touched by their father, although the reports could not be corroborated." Additionally, the court reported the father was "currently unemployed, without a driver's license, and living in a trailer on a friend's property." No other progress was indicated.

A review hearing was held in January 2017. At that time, the father was employed and had regained his driver's license. He stated he was living with a friend but was in the process of obtaining a home. The father had begun individual counseling and had signed a release of information for the DHS. He continued to have supervised visitation with the children. The court directed the DHS to provide the father a "refrigerator or responsibility list" specifically detailing what the father needed to do to regain custody of the children. The court scheduled a permanency-review hearing in six months.

Following the June 2017 permanency-review hearing, the court entered its order granting the parents an additional six months for reunification. The court noted the father remained employed but had still not found suitable housing and generally slept in his vehicle. Though the father may have been eligible for housing assistance, he had not filed a request for assistance until two weeks before the June 2017 hearing, despite DHS involvement with the family since at least 2013.

However, the court did credit the father's participation in and completion of individual therapy, as well as his continued visits with the children. The court determined "substantial progress toward reunification has been made and that it is reasonably likely that the children can safely be returned home with an additional six months of reunification services." The court specified the father was to

> (a) participate in weekly family therapy to re-develop and attachment to the children as well as FSRP services during which he demonstrate the ability to properly care for and supervise the children with knowledge of the children's sexual perpetration against each other and his own history; (b) attend medical and therapy appointments for the children; (c) have regular visitation or interaction with the children with the approval of his counselor and the children's counselor moving from supervised to monitored to unsupervised and overnight visitation; (d) obtain and maintain safe and stable housing for the children adequate to their number; (e) maintain employment or other legitimate source of income to be able to support the children; and (f) participate in a psychiatric evaluation to determine if he should be prescribed any psychotropic medication for the mental disorders for which he is diagnosed and take such medication as prescribed.

The court set another permanency-review hearing to be held within three months.

After rescheduling, a permanency-review hearing commenced on November 15, 2017, with a second day of hearing held on December 13, 2017. In between those dates, the State filed criminal charges against the father for second-degree sexual abuse and incest, alleging the father committed sexual acts with one of the children "during the time frame of January 2013 through and including November 2013." Following the conclusion of the permanency-review hearing, the court entered its order directing the State to file a petition for termination of the parents' parental rights, finding both parents failed to comply with its previously detailed specifications to achieve reunification. As to the father, the court reported he

continued to have no suitable home to which the children could return. The very housing from which the children were removed, a camper, remains the only long-term housing the children's father has made available. He has lost employment and is no longer employed. He lost his driver's license due to failure to pay fines. He was recently arrested, is unable to make bond and remains in . . . jail. The children's father has not complied with all of the requirements for reunification outlined in the order following the first permanency hearing. In particular he has not participated in FSRP services, but has been rude and belligerent, has failed to obtain suitable housing and refused the assistance of the provider to aid him, telling her his housing is none of her business, and has failed to maintain employment or sought other legitimate sources of income to support the children.

The court stated the children had been moved together to one pre-adoptive foster home, and the court included adoption as a permanency goal. Thereafter the State filed its petition for termination of the parents' parental rights.

A termination-of-parental-rights hearing was held May 9 and June 6, 2018. The father did not testify, but he argued, through counsel, that the court should dismiss the termination-of-parental-rights petition or enter an order pursuant to Iowa Code section 232.100, "which would protect the children but would allow the father additional time to dispose of his pending criminal case and secure suitable housing for the children, so that the family could reunite with him." The father maintained the mother had coached the children to accuse him of sexual assault, a conclusion some professionals had previously reached. He also denied sexually abusing his nephew, stating he entered an *Alford* plea in that case to the lesser crime of "simple misdemeanor assault in order to avoid the risk and expense of trial." He further explained he did not appeal the founded DHS assessment concerning the report that he sexually abused his nephew because the father did

not have an attorney appointed to him. Because he had "been accused of being a child molester," the father asserted he

> was unable to sustain suitable employment in his community. Lack of employment creates extreme financial difficulty, in turn making it difficult to pay child support, keep a driver's license, and pay rent to maintain suitable housing for himself and 5 children who were not living with him and who would not have been allowed to live with [him] at any time during this case.
>     . . . .
>     Had the criminal charge not been brought, and had the new child protective assessment not been brought and founded against the father, he would have had a fighting chance of obtaining housing and employment and regaining custody of his children by this time. Therefore, the falsity of the sexual abuse allegations are relevant here.

Following the termination-of-parental-rights hearing, the juvenile court entered its order terminating the parents' parental rights pursuant to Iowa Code section 232.116(1)(f). The father now appeals.

### III. Discussion.

On appeal, the father first argues the juvenile court

> erred in finding the Father's rights should be terminated pursuant to Iowa Code § 232.116(1)(f) rather than making findings and avoiding termination under § 232.116(3)(e) or entering a dispositional order under § 232.117(5) and § 232.100 which would protect the children but would allow the father additional time to dispose of his pending criminal case and secure suitable employment and housing for the children and meet other reunification requirements.

Additionally, the father contends termination of his parental rights was not in the children's best interests because of the close relationship between him and his children. For the following reasons, we disagree.

### A. Suspending Judgment or Other Option to Avoid Termination.

The father does not dispute that the State proved the grounds for termination found by the juvenile court. Rather, he argues the court should have

entered an order pursuant to Iowa Code section 232.116(3) paragraph (e). Under section 232.116(3), the court does not have to terminate parental rights if any of the circumstances contained in section 232.116(3) exist, even if the court determined "that termination is appropriate under section 232.116(2)." *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). The specific circumstance set out in paragraph (e) allows the court to continue the parent and child relationship if the court finds "[t]he absence of a parent is due to the parent's admission or commitment to any institution, hospital, or health facility or due to active service in the state or federal armed forces."

The word "institution" is not defined in chapter 232. *See* Iowa Code §§ 232.2, .68. According to Black's Law Dictionary, an "institution" means "[a]n established organization, esp. one of a public character, such as a facility for the treatment of mentally disabled persons. — *Also termed public institution*." There is no evidence that, at the time of the termination-of-parental-rights hearing, the father was admitted or committed to any "institution." Moreover, this case commenced in 2013. As the father's brief indicates, the father was charged and arrested in November 2017, held on a cash bond, "which was changed a couple of months later to allow release with an ankle bracelet." Upon our de novo review, we agree with the juvenile court that "[c]lear and convincing evidence has not been shown that termination should not occur due to the existence" of the exception set forth in section 232.116(3)(e).

Alternatively, the father argues that instead of proceeding to terminate his parental rights as permitted by 232.117(3), the court should have entered an order under section 232.117(5), which states:

> If after a hearing the court does not order the termination of parental rights but finds that there is clear and convincing evidence that the child is a child in need of assistance, under section 232.2, subsection 6, due to the acts or omissions of one or both of the child's parents the court may adjudicate the child to be a child in need of assistance and may enter an order in accordance with the provisions of section 232.100 . . . .

By way of section 232.117(5), the father asserts the court should have entered an order in accordance with section 232.100, which permits the juvenile court to

> enter an order suspending judgment and continuing the proceedings subject to terms and conditions imposed to assure the proper care and protection of the child. . . . The maximum duration of any term or condition of a suspended judgment shall be twelve months unless the court finds at a hearing held during the last month of that period that exceptional circumstances require an extension of the term or condition for an additional six months.

Although the parent-child relationship is constitutionally protected, *see Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *In re M.S.*, 889 N.W.2d 675, 678 (Iowa Ct. App. 2016), the "State has a duty to assure that every child within its borders receives proper care and treatment." *In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014). If a parent abdicates his or her responsibility to properly care for his or her child, "the State has an obligation to intercede and provide the necessary care." *In re K.M.*, 653 N.W.2d 602, 608 (Iowa 2002). "Iowa Code chapter 232 codifies the balance our legislature has struck between [the] competing interests" of parents and the State. *M.S.*, 889 N.W.2d at 678.

"While the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (quoting *In re D.A., Jr.*, 506 N.W.2d 478, 479 (Iowa Ct. App. 1993)). When a child is removed from his or her parents' care, the parents have a limited

time frame, based upon their child's age, to demonstrate the child can be safely returned to the parents' care. *See A.S.*, 906 N.W.2d at 474; *see also* Iowa Code §§ 232.102(6)(2)(b), .116(1)(f)(3). For children aged four and above, the legislature has determined that time frame is one year. *See* Iowa Code § 232.116(1)(f)(3) ("The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days."); *A.S.*, 906 N.W.2d at 473-74.

The record shows the juvenile court continued to grant the parents additional time to work for reunification, not because of the father's efforts, but because the children remained in the mother's care. Services were offered to the father from the get go—before the father was criminally charged—and his interest seemed minimal. He was not working at the end of 2013 when this case began, and he was unemployed at the time of the termination-of-parental-rights hearing. At the start of the case, though the father clearly had free time to remedy the home's horrible conditions, the father chose to let his children live in filth. There were also concerns at the start of the case regarding the father's mental health and anger-management issues; those concerns still existed at the time of the termination-of-parental-rights hearing.

Moreover, even accepting for the sake of argument that the mother coached the children to make false accusations against the father, the father, in a completely unrelated case, entered an *Alford* plea to the charge that he assaulted his minor nephew. The nephew in that case was related on the father's side of the family, and the nephew alleged he and the father were alone when the contact

occurred. There was no suggestion of coaching occurring in that case. There was no appeal of the founded child-abuse assessment. Despite these facts, the father was uncooperative with the caseworkers and refused to get the evaluation the DHS recommended so that the father could receive the services he needed. Almost two years after he separated from the mother, the father was finally evaluated, but the diagnoses raised further questions about the father's mental health and necessity of medication. The father was specifically told one of the requirements for reunification was that he "participate in a psychiatric evaluation to determine if he should be prescribed any psychotropic medication for the mental disorders for which he is diagnosed and take such medication as prescribed." That requirement still existed at the time of the termination-of-parental-rights hearing, more than two years after his 2015 evaluation.

Iowa Code section 232.100 permits the juvenile court to suspend judgment in its discretion. *See In re T.D.H.*, 344 N.W.2d 268, 271 (Iowa Ct. App. 1983). The juvenile court can "stop the proceeding ( . . . the CINA disposition) and instead impose terms and conditions that 'may include' supervision." *State v. Iowa Dist. Ct.*, 828 N.W.2d 607, 614 (Iowa 2013). But suspending judgment "is considered the 'least' restrictive alternative available following a CINA adjudication, in contrast with section 232.102 which provides for transfer of legal custody of child and placement." *Id.* (cleaned up). Consequently, "when there is a suspended judgment, the child remains with the parent." *Id.* at 615.

Because numerous concerns continue to exist years later, the children could not have been safely placed in the father's care at the time of the termination-of-parental-rights hearing. Rather than continue the CINA proceedings any further,

the juvenile court found termination of the father's parental rights was appropriate. Upon our de novo review of the record, we find no abuse of the juvenile court's discretion in not entering an order pursuant to Iowa Code sections 232.117(5) and 232.100 following the termination-of-parental-rights hearing.

### B. Best Interests and Section 232.116(3) Considerations.

Additionally, the father contends termination of his parental rights was not in the children's best interests because of the close relationship between him and his children. In determining whether termination of parental rights is in a child's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

Here, the father was given several years to demonstrate his ability to care for the children. After services were offered, as they were in 2006 and early 2013, serious concerns remained about the father's ability to safely parent the children at the time of the termination-of-parental-rights hearing. Even excluding any sexual-abuse claims, the father chose to minimally participate throughout the case. By the end, he had little to no contact with the children, to their detriment. In fact, the foster parents told the court that, since the children had been placed with them, "None of the children have ever mentioned their dad." Except for a few instances, the children did not mention the mother "in the three months they have lived with us. Surprisingly, they mention dad even less. He almost always misses his visits. He has only contacted them twice by phone. On those occasions he really only

called to talk to [one of the children]." The evidence does not support the father's claim of a close relationship between him and the children.

Furthermore, delaying these children permanency any longer is clearly not in their best interests. The father was specifically told in the juvenile court's January and June 2017 review orders that addressing his mental-health issues was a prerequisite for reunification. There was no evidence at the termination-of-parental-rights hearing that he had even attempted to address those issues. There is no reason to believe the father will do so in the foreseeable future.

These children have thrived in foster care and are adoptable. Considering the children's safety, the best placement for furthering the long-term nurturing and growth of the children, and the physical, mental, and emotional condition and needs of the children, we agree with the juvenile court that termination of the father's parental rights is in the children's best interests. We find no reason to disturb the court's determination that section 232.116(3) was inapplicable under the facts of this case.

### IV. Conclusion.

Upon our de novo review, we conclude termination of the father's parental rights is in the children's best interests and none of the circumstances set forth in section 232.116(3) exist to make that section applicable. We also believe an order under section 232.100 was not an option under the facts of this case, but in any event, find no abuse of discretion in the juvenile court's decision to proceed with termination of the father's parental rights instead of delaying permanency. We affirm the juvenile court's order terminating the father's parental rights.

**AFFIRMED.**