# IN THE COURT OF APPEALS OF IOWA

No. 22-0439
Filed May 25, 2022

**IN THE INTEREST OF G.B.,**
**Minor Child,**

**A.A., Mother,**
    Appellant,

**L.B., Father,**
    Appellant.
_____

    Appeal from the Iowa District Court for Warren County, Mark F. Schlenker, District Associate Judge.

    The mother and father separately appeal the termination of their parental rights. **REVERSED AND REMANDED ON BOTH APPEALS.**

    Nancy L. Pietz, Des Moines, for appellant mother.

    Thomas G. Crabb, Des Moines, for appellant father.

    Thomas J. Miller, Attorney General, and Toby J. Gordon, Assistant Attorney General, for appellee State.

    Magdalena Reese of the Juvenile Public Defenders Office, Des Moines, attorney and guardian ad litem for minor child.

    Considered by May, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

The mother and father separately appeal the termination of their respective parental rights to their child, G.B., born in 2015. The juvenile court relied on Iowa Code section 232.116(1)(f) (2021) for termination. The mother challenges the statutory ground, claims the loss of her rights is not in the child's best interests, and maintains the parent-child bond is so strong that termination will harm G.B. Alternatively, she asks for six more months to reunify with G.B. As it pertains to his parental rights, the father seems to focus on a best-interests argument and a request for more time.[1]

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) became involved with this family in February 2019 after receiving allegations the father was using methamphetamine and taking the mother's prescription Adderall—an amphetamine. The mother reported the father had a history of taking opiates and was previously prescribed methadone[2] for a period of time. The father agreed to submit to a drug test, which was positive for fentanyl—a drug he is not prescribed.

---

[1] The father also makes some arguments on behalf of the mother. The father cannot rely on the mother's alleged fitness to parent as a reason his rights should not be terminated. *See In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007) ("[The father] did not have standing to assert that argument on her behalf in an effort to ultimately gain a benefit for himself, that is, the reversal of the termination of *his* parental rights."). He also cannot make arguments to bolster the mother's case. *See In re S.O.*, 967 N.W.2d 198, 206 (Iowa Ct. App. 2021) ("[O]ne parent cannot assert facts or legal positions pertaining to the *other parent* because the juvenile court makes a separate adjudication as to each parent." (citing *In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005))).

[2] Methadone is "a synthetic addictive narcotic drug $C_{21}H_{27}NO$ used especially in the form of its hydrochloride for the relief of pain and as a substitute narcotic in the treatment of heroin addiction." *Methadone*, Merriam-Webster, https://www.merriam-webster.com/dictionary/methadone (last visited Apr. 13, 2022).

When asked, the father told DHS it was not his urine that was tested; he said he purchased synthetic urine from a store that promised it was free from substances. He maintained he would only test positive for marijuana if his urine was tested.

On March 4, with the father's consent, G.B. was removed from only his care. The father agreed to leave the family home so G.B. could stay with the mother and was told he needed to address his substance-abuse issues and come up with a plan for pain management[3] that would allow him to safely parent G.B. before returning to live in the family home. The father maintained he handled pain management through his marijuana usage.

The DHS social worker authored a report to the court leading up to the child-in-need-of-assistance (CINA) review hearing in October 2019. In it, he reported the father continued to openly use marijuana for his ongoing pain—admitting it to both his medical doctors and DHS. The father maintained he did not use marijuana around G.B. Still, the father missed both of the drug tests DHS asked of him—one in August and one in September.

In a February 2020 report, the social worker noted the father also skipped the third and fourth drug test DHS asked him to complete. When asked, the father admitting skipping the fourth test—on December 30—because it would be positive for Ecstasy.[4] The social worker praised the mother in the report, noting she had

---

[3] The father admitted he used marijuana daily over the past eight or so years and attributed his use to pain relief aid because he suffers from injuries to his shoulders that required several shoulder surgeries.

[4] Ecstasy, also known as MDMA, is "a synthetic amphetamine analog $C_{11}H_{15}NO_2$ used illicitly for its mood-enhancing and hallucinogenic properties." *Ecstasy*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ecstasy (last visited Apr. 13, 2022).

done well to meet G.B.'s needs on her own while the father was out of the home.

Also, the mother was allowed to supervise visits between the father and G.B., and

the father was generally spending time in the family home daily, both in the morning

before school and again in the evening for a family meal. The social worker

recommended an extension in the case

> so that [the parents] may evaluate their expectations regarding their relationship since [the father] has been unsuccessful in showing an ability to not use illicit drugs. [The mother] will need to determine if they will go their separate ways or how she is going to maintain an appropriate environment for the children.[5]

The court granted the extension in March, concluding the need for removal

would no longer exist in six months if the father participated in substance-abuse

treatment, which he was ordered to do.

In July, the court ordered the father to obtain a substance-abuse evaluation

and comply with any recommended treatment. It also ordered that a hair-stat test

be performed on G.B.[6]

During the August family team meeting, the father agreed to apply for a

medical cannabidiol registration card so he could legally treat his pain. *See* Iowa

Code § 124E.4 (listing requirements to apply for and obtain card). He also

---

[5] The mother's older child from another relationship lived in the home on an every-other-week basis.

[6] It is unclear from the record before us when DHS received the information from the father's substance-abuse treatment facility, but the facility reported the father completed four drug tests between July 8, 2020, and September 25, 2020, and each of the four tests was reported as positive for amphetamines and THC. The father's substance-abuse counselor later informed DHS that the facility's drug-test results do not differentiate between amphetamines and methamphetamine. After the September 25 test, the father completed six additional drug tests, which were all negative for amphetamines. At some point, the father revoked his release, preventing the treatment facility from sharing further information with DHS.

suggested he would move to Texas if the next court hearing did not go well, leaving the mother and G.B. in Iowa. At the same meeting, it was learned that the father and G.B. never submitted to drug testing, as ordered by the juvenile court on July 8. The social worker took them both for testing after the meeting.

Those tests showed positive results for amphetamine and methamphetamine for both the father and G.B. The mother was tested shortly after; her test was only positive for amphetamine, which was expected because of her Adderall prescription. Both parents denied the father used illegal substances in the home and claimed they could not explain how G.B. could have ingested methamphetamine. They admitted another man, a friend of the father's, was living in the home with G.B. and the mother. But the father denied this man could be the cause, stating the man's drug of choice was heroin and the friend was involved in substance-abuse treatment. DHS expressed concern that either the mother "was oblivious to her surroundings and allow[ed G.B.] to have contact with methamphetamine or has allowed [the father] to be around [G.B.] while under the influence"; the county attorney moved to modify disposition to remove G.B. from the mother's care.

As a result of the child's positive drug test, the court modified disposition, placing G.B. in the custody of the maternal grandparents under the supervision of DHS on September 25. Once G.B. was removed from both parents' custody and the family home, the father moved back in.

In October, both the mother and father had positive sweat-patch tests for methamphetamine.

In December, the mother again had a sweat patch test positive for methamphetamine. The parents continued to deny any use of methamphetamine. They claimed the sweat patch results were erroneous and pointed to results from urinalysis, which were not positive for methamphetamine.

In January 2021, the grandparents gave notice they were no longer able to be G.B.'s full-time caregivers. The child was moved to a foster family—his first, but not his last.[7]

In late March, the mother again tested positive for methamphetamine.

The State petitioned to terminate the parents' rights in August 2021, and the termination trial took place over three days: October 27, November 23, and December 21, 2021.

The mother did not test positive for any illegal or unprescribed substances after the March positive for methamphetamine through the final day of the termination trial, December 21—a period of nearly nine months. The father, who was open about his continued use of marijuana to self-treat his chronic pain, was participating in continuing care with a substance-abuse counselor from June 2021 through the final date of the termination trial. The counselor testified the father was required to meet with her at least one time in a three-month period but they were generally meeting monthly. She saw no signs of him using methamphetamine or other stimulants and, from June through December 21, the father tested positive for marijuana and his prescribed methadone but did not test positive for any other substances.

---

[7] By the time of the termination hearing, the child had resided in two different foster homes.

The mother's former romantic partner testified at the termination trial. He is the father of her thirteen-year-old child—G.B.'s half-sibling. He explained that he and the mother share physical care of the teenager. DHS never removed the teenager from the mother's care. The half-sibling's father and the mother wrongly believed they were required to keep the teenager from the mother's care for a period of time, and the father followed what he believed was a requirement; but as of approximately August 2021, the half-sibling's father realized it was just a recommendation that the half-sibling be removed from the mother's care. At that point, the half-sibling's father and the mother returned to their normal, joint physical care schedule. The half-sibling's father testified he has contact with the mother several times per week and does not believe she uses illegal substances; he has no "concerns regarding [the mother's] ability to safely parent" the half-sibling.

The family support specialist (FSS) also testified. She supervises visits between G.B. and the parents twice per week. During these visits, she never noticed any behavioral indicators from either parent of any drug usage. She testified the visits go well and she thinks it is safe for G.B. to be returned to the parents' care.

The family's social worker testified at the termination trial. For the first time, he raised the theme of the father controlling the mother as a reason G.B. could not safely be returned to the mother's care.

The juvenile court filed a written ruling terminating the mother's and the father's parental rights under Iowa Code section 232.116(1)(f). The court concluded G.B. could not be returned to the parents' care, ruling:

A parent has a duty to keep a child free from harm, and the record before this Court is such that [the mother] has failed to provide [a] consistent and convincing case that she could keep this child safe from the conduct of and controlling voice of the child's substance-abusing father, as well as from her own struggle with illegal substances.

Each parent appeals.

## II. Standard of Review.

Our review of termination proceedings is de novo. *D.G.*, 704 N.W.2d at 457.

## III. Discussion.

We recognize each parent has their own rights to and relationship with G.B. *See id.* at 459 ("[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally."). But we also know that these parents live together and remain in a relationship. Each has the goal to share in co-parenting G.B. with the other. We cannot ignore reality and the extent these parents' lives are intermixed when deciding their respective legal challenges.

Here, we only find it necessary to address the parents' request for additional time to work toward reunification. *See In re K.R.*, No. 19-0090, 2019 WL 1486612, at *1 (Iowa Ct. App. Apr. 3, 2019) (declining to consider the section 232.116 three-step analysis for termination of parental rights when the court determined an extension of time was appropriate); *In re R.M.*, No. 12-1886, 2013 WL 264326, at *1 (Iowa Ct. App. Jan. 24, 2013) (same).

To start, we are not unconcerned about the parents' use of illegal substances. The mother tested positive for methamphetamine three times; the

father admitted to taking Ecstasy and other people's prescription amphetamines, and he also tested positive for methamphetamine. And it is inexcusable that then-five-year-old G.B. tested positive for methamphetamine after apparently ingesting the substance.[8] But past positive drug tests alone are not sufficient to terminate parental rights. *See In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016) (ruling positive drug tests are not sufficient to terminate; "the mere fact of use does not establish adjudicatory harm").

When G.B. was removed from the father's care but still living with the mother, DHS commended the mother's parenting skills. The FSS worker testified supervised visits go well and she believes G.B. could safely be returned to the parent's care. And when asked about the mother's parenting, even the social worker begrudgingly admitted that the mother is able to meet G.B.'s needs and none of the FSS workers ever expressed concerns about her ability to parent G.B. Additionally, G.B.'s school teacher indicated there were some minor behavioral concerns with G.B. in the classroom but opined those would improve if G.B. was returned to his parents. Some of the other common indicators of drug use are not present in this case; the mother maintained the family home and employment throughout DHS involvement.

From our perspective, the only fly in the ointment is the mother's positive tests for methamphetamine. We do not minimize these results. But the mother went nearly nine months without testing positive for any unprescribed or illegal

---

[8] G.B.'s hair-stat results for methamphetamine were 3982 pg/mg, with a screening cut-off of 500 pg/mg. At the trial, the maternal grandfather testified he was told G.B. tested positive for methamphetamine "[b]ecause it was ingested."

substances by the final date of the termination trial.[9]  DHS expressed frustration that the mother never took responsibility for or admitted to use that would result in positive drug tests.  But we do not terminate parental rights because a parent refuses to make certain admissions.  *See In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) ("[The State] may not specifically require an admission of guilt as part of the treatment.").  And we also do not terminate parental rights just because a parent failed to comply with DHS's plans; we do not require compliance for compliance's sake.  *See M.S.*, 889 N.W.2d at 681 ("The failure to comply with the case plan is not enough [to terminate parental rights].").  Rather, the operative question is whether the parent can now, or within a short extension of time will be able to, safely care for the child so that the need for removal will no longer exist.  *See* Iowa Code §§ 232.104(2)(b), 232.116(f)(4); *M.S.*, 889 N.W.2d at 681 (reversing termination where the State failed to establish a nexus between the father's drug use and an appreciable risk of adjudicatory harm to the child within the meaning of section 232.102).

Additionally, with his testimony at the termination trial, the social worker raised concerns about the power dynamic in the parents' relationship—suggesting the father controls the mother, which is another hurdle preventing G.B.'s return.  But we have not found anywhere in the record where the parents were alerted DHS believed this was an issue before the termination trial, and the parents were never recommended to participate in couple's counseling or individual therapy.  If

---

[9] Several witnesses testified, including the FSS and the mother's parents; none observed any associated behaviors suggesting drug use by the mother.  The mother also offered a letter from her medical doctor who confirmed similar observations.

DHS believes there is an issue that weighs in favor of terminating parental rights, it needs to alert the parents of the problem and offer services to help early enough in the proceedings that real change may be accomplished. *See In re J.H.*, No. 17-1101, 2017 WL 4570544, at *2 (Iowa Ct. App. Oct. 11, 2017) ("The core of the reasonable efforts mandate is the child welfare agency must make reasonable efforts to 'facilitate reunification while protecting the child from the harm responsible for the removal.'" (quoting *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996)); *cf. In re A.H.*, No. 21-1189, 2022 WL 246258, at *2 (Iowa Ct. App. Jan. 27, 2022) (requiring parents to "ask for the services they believe they need to achieve reunification early enough in the process that those services can obtained—if possible—and provide a benefit to the parent within the statutory timeline set out for terminations"). Moving the goalposts during the termination trial is setting families up for failure. Unlike the juvenile court, we are not persuaded the alleged power imbalance should prevent G.B.'s return to the mother's care.

Under these facts, we conclude G.B. will be able to return to the mother's care after six additional months of negative drug tests. In reaching this conclusion, we focus less on how the mother achieved sobriety and more on the fact that she continues to live a sober life. And we note DHS never removed the mother's teenager from her custody and that child has continued to do well. We recognize DHS and the juvenile court have been involved with this family for much of G.B.'s life, but an extension is in G.B.'s best interests. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) ("Not only must [the parent] show the impediments to placing [the child] with [them] will not exist in six months, we must also consider whether further delay is in [the child's] best interests."). G.B. and the mother are strongly bonded.

And, in the year after the child was removed from the mother's care, G.B. lived with his grandparents and then with two different foster families. We question how integrated into another family G.B. could be. *See* Iowa Code § 232.116(2)(b)(1) (determining the child's best interests includes "whether the child has become integrated into the foster family" and "the length of time the child has lived in a stable, satisfactory environment"). For these reasons, we reverse the termination of the mother's parental rights and give her a six-month extension.

Next, we consider the father's parental rights. But for the testing for illegal substances, no concerns over the actual parenting skills of the father were noted or observed by DHS.[10] Yet the father continued to test positive for marijuana up through the final date of the termination trial. We do not condone his use of the illegal substance, but we note his substance-abuse counselor did not seem to be concerned about this form of pain management. DHS also did not seem concerned; the department's focus was on the father obtaining a medical cannabidiol registration card so his use would be legal—not on his ability to function while using marijuana.[11] *See M.S.*, 889 N.W.2d at 683 ("The record does not establish a nexus between [the father's] cannabis use and an appreciable risk of adjudicatory harm to the child."). To support his progress, the father testified to a close therapeutic relationship with his current drug counselor, who also testified at the termination trial. Under her watch, other than marijuana and the methadone

---

[10] Even after the father removed himself from the home, the case notes reflect positive parenting by both parents. Likewise, the child seemed happy and healthy.
[11] In his petition on appeal, the father asserts he received his medical cannabidiol registration card after the termination trial. This is outside our record, and we do not consider it.

he is prescribed, the father's drug tests were negative from June 2021 through the final day of the termination trial, which is a period of about six months. The father needs to show he can continue to abstain from other, unprescribed drugs. And, after an additional six months of otherwise negative drug tests, we conclude G.B. could be returned to the father's care. *See* Iowa Code § 232.104(2)(b). We also reverse the termination of the father's parental rights and grant him a six-month extension.

## IV. Conclusion.

We reverse the termination of the mother's and the father's parental rights; we grant each parent a six-month extension.

**REVERSED AND REMANDED ON BOTH APPEALS.**

Chicchelly, J., concurs; May, P.J., dissents.

**MAY, Presiding Judge** (dissenting)

I must respectfully dissent. Like the juvenile court, I think the clock has run out for these parents. I cannot justify giving them still more time to work toward reunification. I agree with the majority that it was "inexcusable that then-five-year-old G.B. tested positive for methamphetamine after apparently ingesting the substance." Indeed, given the dangers of methamphetamine, a five-year-old's ingestion of the substance should cause us all to exclaim, "Outrageous!" And yet these parents take no accountability for G.B.'s methamphetamine-poisoning. Instead, they are focused on deflecting blame from themselves. So I question what "specific factors, conditions, or expected behavioral changes" are likely to occur over the next six months that would allow for safe reunification with either parent. *See* Iowa Code § 232.104(2)(b) (2021). Conversely, like the juvenile court, I think the statutory ground for termination under section 232.116(1)(f) is met and termination is in G.B.'s best interest as to each parent. So I would affirm the juvenile court as to both parents.