# IN THE COURT OF APPEALS OF IOWA

No. 23-0518
Filed July 26, 2023

**IN THE INTEREST OF B.W., K.M., and S.M.,**
**Minor Children,**

**J.B., Mother,**
        Appellant,

**G.W., Father of B.W.,**
        Appellant.

_____

        Appeal from the Iowa District Court for Scott County, Christine Dalton Ploof,

District Associate Judge.


        A mother of three children, and the father of the oldest child, appeal the

termination of their parental rights. **REVERSED ON MOTHER'S APPEAL;**

**AFFIRMED ON FATHER'S APPEAL.**


        Jennifer Triner Olsen, Davenport, for appellant mother.

        Rebecca G. Ruggero, Davenport, for appellant father.

        Brenna Bird, Attorney General, and Erin E. Mayfield, Assistant Attorney

General, for appellee State.

        Angela Fritz Reyes, Davenport, attorney and guardian ad litem for minor

children.


        Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

This termination-of-parental-rights appeal involves three children: five-year-old B.W., three-year-old K.M., and two-year-old S.M. Their mother, Jessica, contests the grounds for termination, contends ending their legal relationship is not in the children's best interests, and believes we should preserve her rights because of the closeness of the parent-child relationships. B.W.'s father, Gary, also appeals.[1] He claims that the Iowa Department of Health and Human Services did not make reasonable efforts toward reunification, and he argues termination of his rights was not in his daughter's best interests.

After our independent review of the evidence, we reach different outcomes for each parent. Because the State did not offer clear and convincing evidence that the children could not be returned to Jessica's custody, we reverse the order terminating her parental rights. But we affirm the order terminating Gary's legal relationship with B.W. because it is not in her best interests to wait for him to address his addiction and criminality.

I.      **Facts and Prior Proceedings**

This family has been involved with the department on and off since 2018. Jessica was pregnant that year and tested positive for marijuana upon admission to the hospital for the delivery of B.W. The infant was removed from her home that December because of exposure to marijuana and methamphetamine use. B.W. was adjudicated as a child in need of assistance (CINA), but placed with Jessica.

---

[1] The juvenile court also terminated the parental rights of the father of K.M. and S.M. But the supreme court dismissed his appeal for failure to comply with the appellate rules.

That CINA case closed in October 2019 with a bridge order placing B.W. in Jessica's sole legal custody.

That break from the department's involvement was short-lived. In June 2020, B.W.'s half-brother, K.M.—then three months old—had emergency surgery to dislodge a large wooden screw from his throat. Jessica told authorities she had been sleeping and awoke to choking sounds. At the hospital, K.M. tested positive for cocaine, methamphetamine, amphetamines, THC,[2] and heroin. B.W. tested positive for THC. Jessica admitted using all of those substances except heroin. K.M. and B.W. were adjudicated as CINA but remained in Jessica's care. Less than a year later, S.M. was born testing positive for THC. He was adjudicated as CINA in April 2021.

All three children were removed from Jessica's custody in November 2021 after K.M. came across Fentanyl pills left within his reach in the family's living room. It took three doses of Narcan by emergency responders and an eight-hour drip at the hospital to revive the child. K.M.'s father blamed a visiting friend for leaving the drugs on the coffee table. But the father was arrested for federal drug trafficking and faces decades in prison. The record shows that it is too soon to tell if K.M. suffered any long-term injury from the overdose.

After the children's removal in fall 2021, Jessica kept using drugs for another ten months. But then she changed direction. She successfully completed an inpatient substance program in the fall of 2022 and followed up with appropriate outpatient sessions. In fact, the department caseworker testified that Jessica was

---

[2] Tetrahydrocannabinol is an active ingredient in marijuana. *LuGrain v. State*, 479 N.W.2d 312, 313 (Iowa 1991).

"doing a great job with her aftercare treatment." Jessica also worked to develop a support system by attending NA regularly. Evidence at the January 2023 termination hearing confirmed that she had been clean and sober since September 2022. On top of her substance-abuse progress, Jessica engaged in needed mental-health treatment.

On the home front, the department found that Jessica was keeping a clean residence and had safety-proofed her home to protect the children from accidents. She had regular supervised visits with the children that went well. The caseworker gave her observations of the positive interactions: "A loving relationship, hugging them, responding to them in a way that's appropriate and caring for them, the children going to the mother for their needs." And to keep enhancing her parenting skills, Jessica completed the recommended solution-based casework and safe care curriculum. The service provider testified that when Jessica is "clean and sober she's a great mother."

As for Gary, he was incarcerated for most of this case. Yet he did maintain some phone contact with B.W. while in federal prison. He was placed on work release in July 2022. That summer he participated in supervised visits with B.W. But he absconded from work release in September and was re-arrested in October. He was in jail, and facing sentencing, at the time of the termination hearing.

The children's guardian ad litem reported that she was "on the fence" over the termination decision. She realized that the children would benefit from permanency, but she also supported giving the parents more time. In her view, "the mother has the most potential to do better and reunify with the children."

The juvenile court relied on Iowa Code section 232.116(1) (2022), paragraphs (d), (f), (h), and (i) in terminating Jessica's rights, and paragraphs (d), (f), and (i) in terminating Gary's rights.[3] Jessica and Gary filed separate appeals.

## II.     Scope and Standards of Review

Our review is de novo. *In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021). Under that standard, we give weight to the juvenile court's factual findings, but they do not bind us on appeal. *Id.* We hold the State to the burden of offering clear-and-convincing evidence of the grounds for termination. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). That level of proof is the most demanding evidentiary burden in civil cases. *In re N.C.*, 952 N.W.2d 151, 153 (Iowa 2020). We consider evidence to be "clear and convincing" when we harbor no grave or significant doubt about the correctness of the legal conclusions drawn from it. *Id.*

Termination cases follow a three-step analysis. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). First, we decide whether the State proved a ground for termination under section 232.116(1). *Id.* If so, we consider whether termination is in the children's best interests under the framework in section 232.116(2). *Id.* If the second step is met, we weigh whether any exceptions in section 232.116(3) apply to preclude termination of parental rights. *Id.*

## III.     Jessica's Appeal

In her petition on appeal, Jessica first contends the juvenile court erred in finding statutory grounds for termination. Because the court terminated under four

---

[3] Paragraph (h) applied only to K.M. and S.M. because they were under four years.

alternatives in section 232.116(1), we can affirm on any basis supported by the record. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).

In challenging termination of her parental rights under paragraphs (d), (f), (h), and (i), Jessica contends that the circumstances that led to the CINA adjudication no longer existed by the time of the termination hearing. Her petition on appeal asserts: "the adjudicatory harm as it related to the mother has been alleviated." She also argues: "there was no clear and convincing evidence that the children could not be returned safely" to her custody.

The State's response to the petition on appeal does not address Jessica's statutory-grounds argument, jumping instead to the best-interests analysis.[4] The State's omission does not entitle Jessica to a reversal as a matter of right. *See Bowen v. Kaplan*, 237 N.W.2d 799, 801 (Iowa 1976). But we decline to search the record to find "a theory upon which to affirm the judgment" and will address her challenge in a manner "most consonant with justice." *Id.*

We agree with Jessica that the State's proof fell short of clear and convincing on the final element of each ground for termination. To satisfy paragraph (d), the State had to prove that the circumstance that led to the CINA adjudication continued to exist despite Jessica's receipt of services. *See* Iowa Code § 232.116(1)(d)(2). Similarly, under paragraph (i), the State had to show that

---

[4] We recognize that the heading for Jessica's first issue focuses on best interests, but her supporting legal authority lists section 232.116(1) and the body of the argument contends that the State failed to meet its burden under paragraphs (d), (f) and (i). Jessica's counsel does not cite paragraph (h). But the element challenged under (f) is also present in (h). *See In re D.G.*, No. 20-0587, 2020 WL 4499773, at *3 n.2 (Iowa Ct. App. Aug. 5, 2020) (noting elements in paragraph (f) are "largely similar" to paragraph (h)).

her receipt of services would not correct the conditions that led to the neglect of the children within a reasonable amount of time. *See id.* § 232.116(1)(i)(3). The circumstance that led to adjudication was Jessica's drug abuse accompanied by inattentive parenting. She twice exposed K.M. to life-threatening situations stemming from her use of methamphetamine or her association with others involved in the illegal drug trade.

The State did not prove those circumstances continued to exist despite Jessica's receipt of services. Indeed, the record shows just the opposite. She successfully completed inpatient drug treatment and adopted aftercare strategies. She also embraced parenting skills curricula offered by the department. The department case worker testified that Jessica "completed most, if not all of the components" of the case plan. She did not miss any supervised visits. And she came to those visits well-prepared to engage with all three children. She also started to maintain a safe household and established healthy boundaries with the children's fathers—even if assisted by their incarcerations.

Under paragraphs (f) and (h), the State had to prove that the children could not be returned to Jessica's custody at the "present time."[5] *See In re C.B.,* 611

---

[5] Our case law offers two interpretations for finding that children "cannot be returned" to parental custody as provided in section 232.102, which discusses transfer of a child's legal custody if staying in the home would be "contrary to the welfare of the child." Many cases cite *In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992), which quotes section 232.102(4)(a)(2)—then numbered section 232.102(5)(b)—for the proposition that custody should be transferred only if the court finds "the child cannot be protected from some harm which would justify adjudication of the child as a child in need of assistance and an adequate placement is available." *See, e.g.*, *In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016). But more recent cases observe that our supreme court often describes that element simply as the inability to "safely return" children to a parent's custody.

N.W.2d 489, 494–95 (Iowa 2000) (describing "present time" as date of termination hearing). The State did not offer clear and convincing proof that her home was not safe or that she could not properly supervise the children at the time of the hearing. At best, the State offered testimony from the social workers that, based on Jessica's history, they were concerned that she might relapse in the future. That concern was not baseless. But it was speculative. Any parent with an addiction faces some risk of relapse. Yet parents would have little incentive to enter treatment and battle against substance abuse if even their successful efforts are dismissed as inadequate.

On this record, we harbor significant doubt about the correctness of the termination decision given the progress Jessica made in addressing the circumstances that lead to the CINA adjudications. Before the juvenile court all agreed she is a good mother when she is not using drugs. And by the time of the termination hearing, she had been clean for five months. The State cannot prove grounds for termination by perpetuating worries that she will fall back into her old patterns. We reverse the termination order given the insufficient evidence.[6]

## IV.    Gary's Appeal

Gary first argues that the department failed to make reasonable efforts when it did not help him develop a sobriety plan when he was released from prison. True, the department "has an obligation to make reasonable efforts toward reunification." *In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005). But a parent

---

*See, e.g.*, *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases).

[6] Because we reverse on the statutory grounds, we need not address Jessica's other issues. *See In re S.P.*, 672 N.W.2d 842, 846 (Iowa 2003).

has a concomitant duty to demand more or different services before a permanency or termination hearing. *Id.* The State argues that Gary did not preserve error because he waited until the termination hearing to complain about the adequacy of services. We agree with the State on preservation.

But even if he had preserved error, we would find the department made reasonable efforts. The father was incarcerated for more than half of B.W.'s life. While in federal prison, he was provided parenting education and had ongoing contact with social workers on B.W.'s case. He also had weekly telephone contact with B.W. while incarcerated. He then had in-person visitation after leaving prison, though he went missing for a few months after testing positive for methamphetamine while on work release. At the time of the termination hearing, he was back in jail. His attorney noted in closing that Gary was on mental-health medication and sober while in prison but would need to address his addiction when again released from custody. Under these circumstances, the department made reasonable efforts to reunify Gary with his daughter. *See In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002) ("[W]hat constitutes reasonable services varies based upon the requirements of each individual case.").

Gary next argues that terminating his parental rights did not serve B.W.'s best interests because he worked to maintain a bond with her even when incarcerated. He asserts that she looked forward to their calls and enjoyed their in-person visits. We commend Gary's efforts to keep in touch with his daughter. But the pull of his addiction cut short their process of reunification after his release from prison. Recognizing that setback, he asks for more time to reunify.

Turning to Gary's request to delay permanency, a court may deny termination and give a parent more time for reunification only if the need for removal "will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). And not only must Gary show the obstacles to placing B.W. in his care will not exist in six months, we must also consider whether the delay is in her best interests. *See W.T.*, 967 N.W.2d at 323. Our best-interests analysis is tethered to the statutory test in Iowa Code section 232.116(2). *Id.* Under that statute, we consider the child's safety; the best placement for furthering her long-term nurturing and growth; and her physical, mental, and emotional condition and needs. Iowa Code § 232.116(2).

Delaying termination of Gary's rights is not in B.W.'s best interests. At the January 2023 termination hearing, Gary testified that he could be incarcerated for three to six months and then would ask to be placed in inpatient substance-abuse treatment. He acknowledged needing relapse prevention education. While his candor is encouraging, he has not shown the kind of progress needed to merit more time. The department has been involved with B.W. for most of her five years. She needs a more settled future.

**REVERSED ON MOTHER'S APPEAL; AFFIRMED ON FATHER'S APPEAL.**