**IN THE COURT OF APPEALS OF IOWA**

No. 24-1680
Filed April 9, 2025

**IN THE INTEREST OF K.M.,**
**Minor Child,**

**M.M., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Kimberly Ayotte, Judge.


        A mother appeals the termination of her parental rights.  **REVERSED AND REMANDED.**


        Jonathon P. Tarpey of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant mother.

        Amy K. Davis of Miller, Zimmerman & Evans, P.L.C., Des Moines, for appellee father.

        Brenna Bird, Attorney General, and Natalie Hedberg, Assistant Attorney General, for appellee State.

        Andrea Beth McGinn of Skogerson Mcginn, L.L.C., Van Meter, attorney and guardian ad litem for minor child.


        Considered without oral argument by Ahlers, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

Nine-year-old K.M. "loves her mom and she wants to be with her mom," according to the child's therapist. But after more than three years of services, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) (2024), finding the mother had coached the child into making false allegations of abuse against the father. The mother appeals, challenging each of the three steps in our termination framework. Upon our de novo review of the record, we find the State failed to prove the statutory ground for termination by clear and convincing evidence. So we reverse the court's ruling and remand for further proceedings.

## I.     Background Facts and Proceedings

In January 2021, police were called to the family's home because of a domestic dispute. The father claimed the mother pushed him from behind while he was carrying their daughter—K.M., born in 2015—while the mother claimed the father pushed and stepped on her. The mother obtained a civil protective order the next day. The Iowa Department of Health and Human Services assessed the family and determined K.M. was safe, though the child protective worker noted the child's statement that "daddy stepped on mommy" seemed rehearsed.

The mother filed for divorce the next month. The parents initially agreed that K.M. would be in the mother's physical care, with alternating weekend visitation for the father, plus one night each week. The mother soon moved to modify that temporary agreement because she wanted to move to Florida with the child.

Before a hearing on the mother's motion, both parties underwent psychological evaluations, conducted by the same psychologist. The mother's evaluation resulted in a diagnosis of borderline personality disorder. She obtained an evaluation by a different psychologist, which disputed that diagnosis and concluded the mother was instead suffering from posttraumatic stress disorder. A child and family reporter gathered information about the family and, after interviewing K.M., reported to the district court that the mother "is either coaching [K.M.] on what to say—or at the very least sharing things with her that are completely inappropriate." The report concluded that K.M. should be placed in the parents' joint legal custody and the father's physical care, with visitation for the mother, who had abandoned her plans to move to Florida. The district court adopted that recommendation in an August temporary order but, on the mother's motion, later modified the caretaking schedule so that the mother had K.M. in her care five nights out of every fourteen.

Soon after the August temporary order placing K.M. in the father's physical care, the mother made a report to the department that the father was sexually abusing K.M. The child underwent a sexual assault examination at the beginning of September, which found a small "Y shaped scrape that was actively bleeding at the base of her perineum." The nurse examiner could not determine how the injury occurred but thought "it was possible to have occurred through normal play." The department received a second report of sexual abuse in October. The child was examined again, and a new injury was found on the posterior fourchette. The nurse examiner noted that injury "was a bit deeper than the prior one" and not something the child could have done herself.

During her forensic interviews, K.M. said that her father would hurt her and "dig into her privates." The father denied the allegations. He told the child protective worker investigating the reports that the mother "was willing to do anything" to get K.M. in her care and if the injuries weren't accidental, then the mother "did it to accuse him of doing it." Later testing found a single sperm cell on an external swab of the child's anus from the second exam. The cell could not be tested for DNA and, because the swab was external, the potential for transfer could not be excluded. The reports were not confirmed for sexual abuse but founded for physical abuse by an unknown perpetrator.

In November, the State petitioned to have the child adjudicated as in need of the court's assistance. While a hearing on the petition was pending, the mother reported that the father punched the child twice in the stomach. The report was not confirmed because the child made inconsistent statements about what happened. The protective worker also noted that the father was not alone with the child when the abuse allegedly occurred because his family was supervising his contact with K.M. under a safety plan with the department.

The juvenile court granted the State's petition in January 2022, adjudicating the child under Iowa Code section 232.2(6)(b) (physical abuse) and (c)(2) (failure to exercise a reasonable degree of care in supervising) (2021).[1] The court found:

> The child has been physically abused although the source of the injury and perpetrator is unknown. The child has been placed at risk of injury as a result of the domestic dispute that occurred while the father was holding the child. [K.M.] has been subjected to multiple sexual assault exams. There is evidence that [the] child has

---

[1] These same provisions are now found in Iowa Code section 232.96A(2) and (3)(b) (2024).

been coached or influence[d] by the mother. The child . . . is clearly caught between her two parents.

The court ordered the child to remain in her parents' legal custody. Both parents' contact with K.M. was to be supervised by family members or friends.

After the child was adjudicated, the family started therapy. In a March report, the therapist noted that K.M. had experienced "domestic chaos" and "knows her parents don't like each other." She determined that K.M. "has trouble doing narratives, even non-trauma narratives" and was "developmentally younger than 6 in this area." Because of this, the therapist could not "say she was coached and can't say there was abuse incidents." The parents were directed to continue "their own individual therapy to work on how the other parent triggers them and how to co-parent." And they were referred to child-parent psychotherapy.

In its April dispositional report, the department recommended ending supervision of the parents' contact with K.M. The caseworker noted there was no evidence that the child was "in direct danger from either parent," although she was "at significant risk of untrained observers and questioners," particularly parents, "perhaps inadvertently helping form a narrative for the child." The child's guardian ad litem also recommended ending the supervision requirement, writing in a report to the court that K.M.

> appears comfortable with both her mother and her father, as well as her grandparents. The concern from [the mother's] perspective is that [K.M.] is being sexually abused in the care of her father. The concern from [the father] is that [the mother] is actively coaching [the child] to say the things she says about the alleged abused. The undersigned does not believe that [K.M.] is being sexually abused. The undersigned also does not believe that [the mother] is actively coaching [the child] to say she's being abused in an attempt to alienate her from her father. . . . [K.M.] wants to please her parents. She is at a very impressionable, suggestable age as well. The

undersigned is concerned that this suggestibility coupled with [the mother's] questioning of [K.M.] and [K.M.] being caught in the middle of the parents has resulted in where we're at today with [K.M.] emotionally suffering.

The father contested these recommendations, advocating instead for continued supervision of the mother's contact with K.M. The juvenile court denied the father's request in its dispositional order, adopted the recommendations to lift the supervision requirements for both parents, and continued the child in the father's custody.

The family started the recommended child-parent psychotherapy after this dispositional order. At the therapist's intake session with the child and mother in May, while the mother was out of the room, K.M. repeated the sexual abuse allegations that she had made earlier in the case. But at a later session in August, the child told the therapist "that her father does not hurt her and that her mother told her to say that." K.M. shared that she was "afraid to tell the truth and did not want this therapist to speak with her mother because her mother would be angry at her for telling the truth." But the child also "stated that she loves both of her parents and wants to continue to see both parents." Based on this information, the department sought to modify the dispositional order to formally remove the child from the mother's custody and return to supervised contact only. The juvenile court granted the department's motion, as well as the father's request for concurrent jurisdiction.

At the end of December, the mother moved for expanded visitation with the child. Her motion noted that since the last hearing, she had completed parenting classes and group therapy, along with consistently attending individual therapy and

restarting child-parent psychotherapy. The department's January 2023 report to the court recommended increasing the mother's visits, highlighting statements from the visitation supervisor that "she has only seen [K.M.] come out of her shell at visits with mom." The caseworker also noted the father was trying to control the mother's visits by, for example, instituting a rule that K.M. could only have one snack per week. And he was questioning the child at the end of her visits with the mother. The report concluded by warning the parents that "there needs to be significant improvements in the way [they] engage with one another and co parent." Over the father's objection, the court granted the mother's request for expanded visitation, leaving the supervision level at the department's discretion.

By the end of February, the mother had progressed to semi-supervised visitation with K.M. But that didn't last long. In April, the father moved to modify the dispositional order to return the mother to fully supervised visitations, alleging the child "has exhibited behavior consistent with emotional dysregulation after spending time alone with her mother." The child's therapists and guardian ad litem did not observe the same emotional disturbances, although they did note that K.M. was reporting that "her dad was lying" again. The guardian ad litem also reported that the child wanted her mother's visits to be supervised "because her mom is lying" about things "like that her dad hurt her." The juvenile court granted the father's request to return the mother's visits with the child to fully supervised, finding that without supervision, the mother "is unable to have emotionally safe and appropriate conversations with her child."

Meanwhile, the parties' divorce was finalized. The district court denied the father's request for sole legal custody and placed the child in the parties' joint legal

custody, concluding that while "apparent tension exists between the parties, it is not intractable." But the court granted the father's request for physical care of K.M., finding the mother had tried to coach and alienate the child from the father. The dissolution decree set out visitation phases for the mother with supervision levels dependent, in part, on the mother refraining "from influencing the child to believe her father abused her in any way which can be shown by no NEW allegations of abuse, no new reports by [the child] that mom is coaching or influencing her to make allegations."

Yet in June, after a supervised visit with K.M. at a swimming pool, the mother made a report to the department that the child said her father "has touched where her 'swimsuit covers.'" The mother told the child protective worker investigating the report that while they were swimming, the child "grab[bed] her in inappropriate areas." She asked the child if anyone was touching her, and K.M. responded, "Daddy." The child protective worker interviewed K.M. and asked whether she accidentally touched her mother at the pool. K.M. said no at first. But then the child said that she did touch her mother's private parts under the water because she was trying to tickle her and get her to laugh. This report was also not confirmed. After this incident, the department moved the mother's visits with the child to a therapeutic setting.

As the permanency hearing approached in September, the department recommended closing the case by transferring "full custody" to the father with supervised visitation between the mother and K.M. The caseworker stated, "The professionals do not feel it would be best to terminate parental rights," noting that K.M. "loves her mother and wants to continue to see her." The guardian ad litem

agreed with that plan and recommended ending the therapeutic-only visitation for the mother.  The father, however, urged the juvenile court to direct the State to file a petition to terminate the mother's parental rights.  The court denied that request in its October order but warned the mother that if she "continue[d] to disregard court expectations or seek ways to negatively influence her child, the court may be forced to reconsider that determination."  The court placed the child in the father's sole legal custody, with continued supervised visitation for the mother.  The father was later granted concurrent jurisdiction to modify the dissolution decree.

The mother seemed to take the juvenile court's warning to heart.  She continued working on her mental health with her individual therapist—as she had throughout the case—and completed more parenting classes.  Her therapist, as well as the family therapist, reported progress was being made.  During a family therapy session, while her mother was out of the room, K.M. told the therapist that "she lied to her mom about her dad hurting her because she wanted to make her mom happy."  The therapist later reported that the child stated she no longer felt pressure from the mother to lie, and the mother "is now asking more open ended questions which gives [K.M.] the chance to respond freely."  So, in March 2024, the juvenile court granted the mother's request to move to semi-supervised visitation.  But the court cautioned, "If reports of coaching, influencing, or questioning by [the mother] reoccur, visits should return to fully supervised."

After the mother's first supervised visit, the father moved to return her visitation to fully supervised because the child told the worker who drove her home that her mother "kept saying that I'm still telling my dad's lies," among other things.  The mother denied making these statements.  The department had planned to

keep the mother's next visit at the semi-supervised level, but the juvenile court immediately granted the father's motion pending a hearing. Following that hearing, the court determined that K.M.'s statements, as reported by others, were credible and found the mother "continues to demonstrate by her behaviors that supervised visits are the least restrictive option that allows for [the child] to have a continuing relationship with her mother as she so desires."

Shortly after the court issued its order, the mother went to Florida to care for her ailing grandmother, who had been placed on hospice. While she was away, the mother mailed the guardian ad litem letters and gifts to pass on to the child. Many of the letters, which were not given to K.M., said they would be together "forever" and that the mother would see her "soon." The mother returned to Iowa at the end of July and continued supervised visits with the child.

When the juvenile court learned about the mother's letters and a failed supervised phone call where the mother asked the child if she should just "stay away," the court changed its permanency goal to termination of the mother's parental rights. The State filed the petition in August. After a hearing in September, the juvenile court granted the State's petition, terminating the mother's parental rights under Iowa Code section 232.116(1)(f). The mother appeals.

## II. Standard of Review

"Termination proceedings are reviewed de novo." *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We give weight to the factual findings of the juvenile court but are not bound by them. *Id.* Given the fundamental interest at stake—the constitutionally protected relationship between parent and child—we "cannot rubber stamp what has come before; it is our task to ensure the State has come

forth with the quantum and quality of evidence necessary to prove each of the elements of its case." *In re M.S.*, 889 N.W.2d 675, 678–79 (Iowa Ct. App. 2016).

## III. Analysis

In our de novo review of the juvenile court's termination ruling, we use a three-step analysis that asks whether the State proved by clear and convincing evidence that (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *L.B.*, 970 N.W.2d at 313; *see also* Iowa Code § 232.116(1)–(3). The clear and convincing standard is the "highest evidentiary burden in civil cases. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *M.S.*, 889 N.W.2d at 679. Under this demanding standard, we find the juvenile court erred in determining that the State met its significant burden of proof.

## IV. Analysis

The mother first challenges the sufficiency of the evidence supporting the only statutory ground for terminating her parental rights—Iowa Code section 232.116(1)(f). She contests the final element of that ground, which required the State to prove "[t]here is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102." Iowa Code § 232.116(1)(f)(4). "[A] child cannot be returned to [the custody of] the [child's] parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992); *see also* Iowa Code § 232.102(4)(a)(2).

"Determining whether the State met its burden requires a look at the reasons [the department] advanced for termination." *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). In its termination report, the department stated that efforts at co-parenting have failed and continuing to have the child "in the middle impacts her emotional and mental health." Because the parents cannot work together, the department recommended terminating the mother's parental rights, which "will allow [K.M.] to move forward." The caseworker expanded on that idea at the termination hearing, testifying that he believed "the risk of a possible future District Court modification by [the mother] presents a risk of harm necessitating termination today" because "there wouldn't be a permanency involved" if the "district court order is getting modified."[2]

But none of the harms listed in section 232.96A for adjudicating a child in need of the court's assistance mention a child's need for permanency. And that consideration is more appropriate in the second step of our analysis—whether termination is in the child's best interests. *See, e.g.*, *In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016) (noting that "when we evaluate whether termination is in the child's best interest, it is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent" (cleaned up)).

---

[2] We understand the caseworker's concern—which was shared by the guardian ad litem—that the mother could try to modify the dissolution decree if her parental rights were not terminated. To do so, however, she would need to meet a "heavy burden." *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983) (describing that burden for custody and physical-care modifications).

Setting that concern aside, we agree with the mother that the "crux of the State's argument is that [the mother], and her alleged coaching, represent an ongoing threat of emotional harm to the minor child that would prevent reunification." In concluding the State proved the statutory requirements for termination under section 232.116(1)(f) were met, the juvenile court found the child

> was subjected to harm as a result of the conflict between the parents from the divorce, the numerous allegations of abuse resulting in [the child] being subjected to physical examinations, and concerns of [the mother] coaching [the child] to make false allegations of abuse. . . . [The mother] continues to either intentionally or unintentionally have inappropriate conversations with [the child] that create emotional harm to [the child].

We conclude the evidence does not support the court's ruling, primarily because of the lack of lay and expert testimony causally linking the child's mental or emotional distress to the mother's conduct, along with statements from the child's therapists undermining that link.

Iowa Code section 232.96A(3)(a) states that a child may be adjudicated as a child in need of assistance if the child "has suffered or is imminently likely to suffer harmful effects" because of "[m]ental injury *caused by* the acts of the child's parent, guardian, or custodian." (Emphasis added.) A "mental injury," in turn, is defined as "a nonorganic injury to a child's intellectual or psychological capacity as evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior." Iowa Code § 232.2(39).

K.M. was diagnosed with generalized anxiety disorder, the symptoms of which include "rapid speech, feeling restless, excessive worry that is difficult to control, muscle tension, and somatic complaints." Her therapists, however, could

not connect that diagnosis to the mother's actions, with one noting that K.M. was "an anxious child in general, not necessarily due to the things that have happened." *Cf. id.* § 232.96(3)(a) (requiring the mental injury to be "caused by" a parent's acts). Despite that anxiety, all the professionals involved with K.M. described her as a happy and well-adjusted child. She did well in school and participated in extracurricular activities like soccer. Thus, when the department investigated a report from the father in May 2023 that the mother was coaching the child again, the child protective worker—in consultation with K.M.'s therapists—concluded there was not a preponderance of evidence that the mother knowingly engaged K.M. "in conversations which were causing a substantial impairment in her ability to function."

Indeed, at the termination hearing, the child's long-time individual therapist testified the only symptom that K.M. still exhibited from her anxiety diagnosis was "some sleep struggles." While the child "gets stressed out pretty easily" and "worries about what's going to happen next," the therapist did not see anxiety from her during their appointments. Instead, K.M. "typically presents as excited and happy and, like, full of energy." Even when the child told the therapist about her mother's statements at their last semi-supervised visit in March 2024, the therapist said she was "just her normal, typical self. She told me about it, and we talked through it." Because the child was doing well, the therapist was ready to reduce her sessions from every two weeks to monthly.

These facts are different from adjudication cases where we have found children had suffered, or were imminently likely to suffer, mental injury from being placed in the middle of their parents' disputes. *See, e.g.*, *In re J.S.*, No. 16-0125,

2016 WL 1359122, at *5 (Iowa Ct. App. Apr. 6, 2016) (affirming adjudication for mental injury where the child's pediatrician linked her severe behavior problems, which required three mental health commitments, to the mother's "manipulation and pattern of interactions intended to alienate the girl from both medical providers and her father"); *In re J.S.*, No. 14-1014, 2014 WL 4938012, at *3 (Iowa Ct. App. Oct. 1, 2014) (affirming adjudication for mental injury where all three children tried to harm themselves because of the emotional stress from their parents' vindictive relationship); *In re E.R.*, No. 14-0850, 2014 WL 4937999, at *5 (Iowa Ct. App. Oct. 1, 2014) (affirming adjudication for mental injury where one child received inpatient mental health treatment, the other suffered from stress-induced alopecia, and both missed school because of the parents' hostile relationship).

The facts of this case are also different from ones where we have affirmed the termination of a parent's rights after the parent made repeated and unfounded claims of sexual abuse.[3] *See, e.g.*, *In re F.M.*, No. 22-1756, 2023 WL 152486, at *2–4 (Iowa Ct. App. Jan. 11, 2023) (affirming termination under section 232.116(1)(f) where the mother made eight unfounded reports that the child was sexually abused, the mother physically examined the child for signs of sexual abuse after visits with her father, and the child was resistant to visits with the mother); *In re T.D.*, No. 07-0485, 2007 WL 2119018, at *4 (Iowa Ct. App. July 25, 2007) (affirming termination under Iowa Code section 232.116(1)(f) where

---

[3] Some documents in the record state that there were ten reports to the department alleging physical and sexual abuse by the father, but there are only five child protective assessments in the record before us. One of those involved a report the father made against the mother. Another was referred by the police after the parties' domestic dispute in January 2021.

the mother made repeated efforts to document sexual abuse of the child by her father, including by videotaping the child's genitalia and physically examining the child in a bathroom during a supervised visit).

While we do not condone the mother's actions, we conclude based on this record that the State did not prove the statutory ground for termination by clear and convincing evidence. As a result, we need not address the other two steps in the termination analysis. *See L.B.*, 970 N.W.2d at 313 ("Because we conclude that the statutory grounds for termination have not been met, we do not address the second and third questions."). The juvenile court's order terminating the mother's parental rights is accordingly reversed, and the case is remanded for further proceedings.

**REVERSED AND REMANDED.**